**PARAMOUNT PICTURES, Inc., et al. v. LANGER et al.**

**SAME v. STRUTZ.**

Nos. 882, 907.

District Court, D. North Dakota, S. D.

July 14, 1938.

Thomas D. Thacher, of New York City, George W. Thorp, of Fargo, N. D., Joseph W. Finley, of St. Paul, Minn., and A. C. Bickford and Louis P. Phillips, both of New York City, for plaintiffs.

Abram F. Myers, of Washington, D. C., John P. Devaney and Louis B. Schwartz, both of Minneapolis, Minn., Francis Murphy, of Fargo, N. D., and Alvin C. Strutz, Atty. Gen., of North Dakota, for defendants.

Before SANBORN and THOMAS, Circuit Judges, and SULLIVAN, District Judge.

PER CURIAM.

Chapter 165, Laws of North Dakota of 1937, the validity of which is challenged, is entitled, "An Act to prohibit the operation of motion picture theaters which are owned, controlled, managed, or operated, in whole or in part, by producers or distributors of motion picture films, or in which such producers or distributors have any interest." The full text of the Act will be found in the footnote.[1] The purpose and effect of the Act are exactly as stated in its title. It became effective March 15, 1938.

---

[1] "Be it Enacted by the Legislative Assembly of the State of North Dakota:

"§ 1. *Definitions.*] For the purpose of this Act, unless the context otherwise requires:

"(1) The term 'Motion Picture Theater' or 'Theater' includes any place in which motion pictures are publicly exhibited and to which an admission price is charged.

"(2) The term 'Motion Picture Film' or 'Film' includes all motion picture films (whether copyrighted or uncopyrighted), including positive and negative prints, and copies or reproductions of such prints, which films contain photoplays or other subjects and are produced for public exhibition.

"(3) The term 'Person' includes an individual, partnership, association, joint stock company, trust, or corporation.

"(4) The term 'Distributor' includes any person who engages or contracts to engage in the distribution of motion picture films, whether as seller, lessors, or licensor, and whether the distribution is effected by means of sale, lease, license, contract, or any other type of agreement whereby the film is supplied for public exhibition.

"§ 2. *Effective Date.*] This Act shall become effective twelve months after its enactment.

"§ 3. *Operation Prohibited.*] It shall be unlawful for any motion picture theater to be operated in this State which is owned, controlled, managed, or operated, in whole or in part, by any producer

At the time of the approval of the Act (March 15, 1937) there were, and there are now, 10 motion picture theatres (of a total of approximately 168) in the State of North Dakota affected by it—3 in Fargo, 2 in Jamestown, 3 in Minot, and 2 in Grand Forks. Those in Minot and Grand Forks are operated by plaintiff Minnesota Amusement Company (hereinafter referred to as "Minnesota"), a Delaware corporation which is a wholly owned subsidiary of plaintiff Paramount Pictures, Inc. (hereinafter referred to as "Paramount"), a New York corporation. Those in Fargo and Jamestown are operated by plaintiff American Amusement Company (hereinafter referred to as "American"), a Minnesota corporation, and a wholly owned subsidiary of the plaintiff Minnesota. Plaintiff Paramount, a producer and distributor of motion pictures, is, by reason of its ownership of the capital stock of plaintiff Minnesota, interested in the theatres owned or leased and operated by Minnesota and American. Therefore, the operation in North Dakota of these 10 theatres since March 15, 1938, has been in violation of the provisions of Chapter 165. The operation of the theatres has been, and, if permitted to continue, will be profitable to the plaintiffs. Large sums of money have been invested by them in these theatres. The buildings in which the theatres are located are specially adapted for use as theatres. If the plaintiffs are prevented from operating their theatres, they will suffer a substantial loss. Were it not for the Act complained of, the operation of these theatres in North Dakota would be legal. If the Act is invalid, its invalidity should be declared and its enforcement enjoined. If it is not invalid, these suits should be dismissed.

or distributor of motion picture films or in which any such producer or distributor has any interest, direct or indirect, legal or equitable, through stock ownership or otherwise.

"§ 4. *Affidavit to Be Filed.*] As a condition of the lawful operation of a motion picture theater in this State the person operating it shall file with the Secretary of State within thirty days after the date on which this Act becomes effective or after the date on which the operation of the theater is begun, whichever is the later, and annually thereafter on or before the fifteenth day of January an affidavit that such theater is not owned, controlled, managed, or operated, in whole or in part, by any producer or distributor of motion picture films, and that no such producer or distributor has any interest, direct or indirect, legal or equitable, through stock ownership or otherwise, in such theater.

"§ 5. *Civil Proceedings.*] The District Courts of this State shall have jurisdiction to prevent and restrain violations of this Act; and it shall be the duty of the several State's Attorneys of the State in their respective Counties, under the direction of the Attorney General, to institute proceedings to prevent and restrain such violations. Such proceedings may be by way of petition, setting forth the case and praying that such violations shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified, the Court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition, and before final decree, the Court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises. Whenever it shall appear to the Court before which any such proceeding may be pending that the ends of justice require that other parties should be brought before the Court, the Court may cause them to be summoned.

"§ 6. *Criminal Penalties.*] Every person who operates a motion picture theater in this State the operation of which is prohibited by Section III, or who fails to file the affidavit as and when required by Section IV, or who knowingly makes any false statement in such affidavit, shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine not exceeding Ten Thousand Dollars, or by imprisonment for not exceeding one year, or by both, in the discretion of the Court. In the case of a corporation, the violation of this Act shall be deemed to be also that of the individual directors, officers or agents of such corporation who have authorized, ordered, done, or had knowledge of any of the Acts or omissions constituting in whole or in part such violation, and upon conviction thereof any such director, officer, or agent shall be punished by fine or imprisonment, or both, as in this Section provided.

"§ 7. *Separability.*] If any provision of this Act is declared unconstitutional, or the applicability thereof to any person or circumstances is held invalid, the validity of the remainder of the Act and the applicability of such provision to other persons and circumstances shall not be affected thereby.

"Approved March 15, 1937."

Stated briefly, the contentions of the plaintiffs are:

1. The Act arbitrarily deprives the plaintiffs of their property and property rights without due process of law, and denies to them the equal protection of the laws, in violation of the due process and equal protection clauses of the Fourteenth Amendment to the Constitution of the United States.

2. If the Act is interpreted as having the purpose and effect of regulating the licensing and distribution of motion pictures in North Dakota, the Act imposes direct burdens on interstate commerce (Constitution, Section 8, Article 1 [U.S.C.A.Const. art. 1, § 8]) and impairs rights protected by the Federal Copyright Law (U.S.C. Tit. 17, 17 U.S.C.A. § 1 et seq.).

The plaintiffs' arguments supporting these contentions are, in brief, as follows:

First. The Act, upon its face, goes far beyond the reasonable necessity of legislative regulation in that it is designed to prevent the operation of a theatre in which a producer or distributor has an interest, however small that interest may be, and requires the disposition by the producer of existing interests presently owned, regardless of their character and regardless of their relation to the actual control and operation of the theatre.

Second. The Act cannot be sustained as an anti-monopoly or unfair trade statute because: (1) its prohibition is not confined to acts intended to destroy or injure competition or to unfair trade practices; (2) there is no evidence to justify a finding that there is a monopoly, or a reasonable anticipation of monopoly, in the production, distribution or exhibition of motion pictures, or any agreements, combinations or conspiracies among producers or distributors to restrain trade or competition with respect to the production, distribution or exhibition of motion pictures, or any policy adopted by them to favor affiliated theatres (those in which a producer or distributor has a financial interest) as against unaffiliated or independent theatres; (3) it drives out of the field of exhibition the affiliated exhibitor, and leaves the field to competitors, against the public interest and for the sole interest of a class seeking to exclude a powerful competitor; (4) the exclusion from trade and from any interest whatsoever, whether controlling or not, in a lawful and profitable theatre business has no relation to the prevention or correction

of any evils which might reasonably be believed to exist therein, and is unreasonable, arbitrary, capricious and unjust in its drastic and unnecessary deprivation of property rights; (5) the means provided by the Act to accomplish the policy declared by it have no reasonable relation to any proper public purpose with which the Legislature was competent to deal, and are unnecessarily harsh and oppressive.

Third. The Act cannot be justified as a reasonable regulation of motion picture theatres in the interest of the public health, safety or morals, because, (1) the contention that it has any relation thereto is purely fanciful; and (2) the State has complete authority to enact laws which will fully protect the health, safety and morals of the theatre-going public without prohibiting the operation of the theatres belonging to any class of exhibitors.

Fourth. The practices of producer-exhibitors which are complained of and which the Act is intended to prevent, prohibit or correct, relate to competition in the distribution and licensing of films protected by copyright and shipped in interstate commerce, and are therefore subject to regulation only by Federal authority.

The defendants contend that the Act is a valid statute constituting a proper exercise of the police power of the State of North Dakota (1) to regulate and prevent the growth and development of monopolies or restraints of trade in the business of public exhibition of motion pictures in the State; (2) to protect independent exhibitors (those unaffiliated with a producer or distributor of films) against the unfair competition and unfair trade practices of those occupying the dual position of producers and exhibitors of motion pictures; (3) to eradicate the evils of competition between small independent theatres or groups of theatres and chains of affiliated theatres grown so large as to constitute a menace to the general public welfare; (4) to protect the independent exhibitors of the State against the unfair advantages of large chains of affiliated theatres, due to their superior buying and bargaining power, wealth and organization; (5) to prevent present abuses or those which are to be reasonably anticipated as resulting from or inherent in the operation in North Dakota of theatres in which producers or distributors are interested (affiliated theatres); and (6) to promote the public health, welfare and morals by rendering all theatres

in North Dakota subject to community or local influence with respect to their operating policies and selection of films.

Some of the issues presented for determination can be eliminated without lengthy discussion.

■ The Act, by its terms, relates only to the operation of motion picture theatres within the confines of the State. It does not purport to relate, and could not be construed as relating, to the distribution or licensing of films. It seems clear to us that any remote effect that the Act might have upon the distribution of films in interstate commerce or upon the rights of producers or distributors under the Copyright Law could not sustain a conclusion that the Legislature of North Dakota had invaded a field exclusively reserved to the Congress of the United States. As to interstate commerce, see Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 426, 56 S.Ct. 513, 515, 80 L.Ed. 772; Crescent Cotton Oil Co. v. Mississippi, 257 U.S. 129, 135, 136, 42 S.Ct. 42, 43, 66 L.Ed. 166. As to copyright interference, see Straus and Straus v. American Publishers' Ass'n, 231 U.S. 222, 34 S.Ct. 84, 58 L.Ed. 192, L.R.A.1915A, 1099, Ann.Cas.1915A, 369; Standard Sanitary Mfg. Co. v. United States, 226 U.S. 20, 33 S.Ct. 9, 57 L.Ed. 107.

■ We see no merit in the contention that the Act can be justified as a measure intended to safeguard the public health, safety or morals, because (1) there is no basis for believing that the operation of affiliated theatres in the State has, or will have, any reasonable relation thereto, and (2) any indirect effect which the presence of these 10 affiliated theatres in the State might possibly be conceived to have on the health, safety and morals of their patrons would not warrant excluding them from the State.

■ So far as the equal protection clause of the Fourteenth Amendment, U.S.C.A. Const. Amend. 14, is concerned, it is readily apparent that there are distinctions between the two sorts of exhibitors—affiliated and independent—which might well justify a difference of treatment, if the Legislature had the power to enact this legislation. Compare American Sugar Refining Co. v. Louisiana, 179 U.S. 89, 21 S.Ct. 43, 45 L.Ed. 102; Brown-Forman Co. v. Kentucky, 217 U.S. 563, 30 S.Ct. 578, 54 L.Ed. 883; State Board of Tax Commissioners v. Jackson, 283 U.S. 527, 51 S.Ct. 540, 75 L.Ed. 1248, 73 A.L.R. 1464, 75 A.L.R. 1536; Crescent

Cotton Oil Co. v. Mississippi, 257 U.S. 129, 42 S.Ct. 42, 66 L.Ed. 166; Nebbia v. New York, 291 U.S. 502, 521, 54 S.Ct. 505, 509, 78 L.Ed. 940, 89 A.L.R. 1469.

The vital and controlling question in these cases, as we see it, is whether the Act is violative of the due process clause of the Fourteenth Amendment in that it has no reasonable relation to the prevention of monopoly, restraints of trade, unfair competition, unfair trade practices, or the maintenance in North Dakota of a free and open market for motion picture films, in which market all exhibitors may compete on a substantially equal basis.

The general rules which are to be applied in determining whether a challenged state statute offends against the due process clause of the Constitution of the United States are more easily stated than applied.

■ "The guaranty of due process * * * demands only that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." Nebbia v. New York, 291 U.S. 502, 525, 54 S.Ct. 505, 510, 78 L.Ed. 940, 89 A.L.R. 1469; West Coast Hotel Co. v. Parrish, 300 U.S. 379, 398, 57 S.Ct. 578, 585, 81 L.Ed. 703, 108 A.L.R. 1330.

■ Upon proper occasion, and by appropriate measures, the state may regulate a business in any of its aspects. Nebbia v. New York, supra, page 537, 54 S.Ct. page 516.

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio. 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U.S. 197, 337, 338, 24 S.Ct. 436, 48 L.Ed. 679. And

it is equally· clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the' rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal." Nebbia v. New York, supra, page 537, 54 S.Ct. page 516.

█ The legislature is primarily the judge of the necessity of the law. Every possible presumption is in favor of its validity, and, though the court may regard it as unwise, it may not be annulled unless palpably in excess of legislative power. McLean v. Arkansas, 211 U.S. 539, 547, 29 S.Ct. 206, 53 L.Ed. 315; Tanner v. Little, 240 U.S. 369, 385, 36 S.Ct. 379, 60 L.Ed. 691; Green v. Frazier, 253 U.S. 233, 240, 40 S.Ct. 499, 501, 64 L.Ed. 878; O'Gorman & Young, Inc. v. Hartford Fire Ins. Co., 282 U.S. 251, 257, 258, 51 S.Ct. 130, 131, 132, 75 L.Ed. 324, 72 A.L.R. 1163; Gant v. Oklahoma City, 289 U.S. 98, 102, 53 S.Ct. 530, 532, 77 L.Ed. 1058; Nebbia v. New York, supra, page 538, 54 S.Ct. page 516; West Coast Hotel Co. v. Parrish, supra, page 398, 57 S.Ct. page 585.

"The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people." Nebbia v. New York, supra, pages 538, 539, 54 S.Ct. page 516.

█ There is no closed class. of businesses affected with a public interest, and the function of the courts, in the application of the Fourteenth Amendment, is to determine in. each case whether circumstances justify the challenged regulation as a reasonable exertion of governmental' authority or condemn it as arbitrary or discriminatory. Wolff Packing Co. v. Court of Industrial Relations, Kansas, 262 U.S. 522, 535, 43 S.Ct. 630, 632, 67 L.Ed. 1103, 27 A.L.R. 1280; Nebbia v. New York, supra, page 536, 54 S.Ct. page 515.

█ Any industry, for an adequate reason, may be subjected to control for the public good. Nebbia v. New York, supra, page 536, 54 S.Ct. page 515. Certain kinds of businesses may be prohibited, and the right to conduct a business may be conditioned. Nebbia v. New York, supra, page 528, 54 S.Ct. page 512; Great Atlantic

& Pacific Tea Co. v. Grosjean, 301 U.S. 412, 425, 426, 57 S.Ct. 772, 777, 81 L.Ed. 1193, 112 A.L.R. 293; Crescent Cotton Oil Co. v. Mississippi, 257 U.S. 129, 42 S.Ct. 42, 66 L.Ed. 166.

"When the action of a legislature is within the scope of its power, fairly debatable questions as to its reasonableness, wisdom, and propriety are not for the determination of courts, but for the legislative body, on which rests the duty and responsibility of decision." South Carolina State Highway Dept. v. Barnwell Brothers, Inc., 303 U.S. 177, 190, 191, 58 S.Ct. 510, 517, 82 L.Ed.——.

█ If, in the public interest, a legislature deems it necessary to mitigate the evils of competition between small chains and large chains, or to discourage the activities within the state by chains grown so large as to menace the public welfare, it may adopt measures to accomplish those ends. Great Atlantic & Pacific Tea Co. v. Grosjean, supra, pages 426, 427, 57 S.Ct. pages 777, 778.

█ It is not a denial of due process to adjust legislation to meet a local evil resulting from business practices and superior economic power, even though the advantages and power are largely due to the fact that the persons affected do business in other states. Great Atlantic & Pacific Tea Co. v. Grosjean, supra, page 427, 57 S.Ct. page 778.

█ The use of property and the making of contracts are normally matters of private, and not of public, concern. "The general rule is that both shall be free of governmental interference. But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his ᵥfreedom of contract to work them harm." Nebbia v. New York, supra, page 523, 54 S.Ct. page 510. See, also, Wolff Packing Co. v. Court of Industrial· Relations, Kansas, 262 U.S. 522, 534, 43 S.Ct. 630, 632, 67 L.Ed. 1103, 27 A.L.R. 1280, and Tyson & Bro. United Theatre Ticket Offices v. Banton, 273 U.S. 418, 429, 47 S.Ct. 426, 427, 71 L.Ed. 718, 58 A.L.R. 1236.

█ Determination by a legislature as to what constitutes a proper exercise of its police power is not final and conclusive, but is subject to supervision by the courts. Lawton v. Steele, 152 U.S. 133, 137, 14 S.

Ct. 499, 38 L.Ed. 385; Mugler v. Kansas, 123 U.S. 623, 661, 8 S.Ct. 273, 31 L.Ed. 205; Chicago B. & Q. Ry. Co. v. Illinois, 200 U.S. 561, 593, 26 S.Ct. 341, 50 L.Ed. 596, 4 Ann.Cas. 1175.

"The question in each case is whether the legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination, or the oppression or spoliation of a particular class." Holden v. Hardy, 169 U.S. 366, 398, 18 S.Ct. 383, 390, 42 L.Ed. 780.

█ The presumption that legislative action is valid is a presumption of the existence of factual conditions supporting the action, and is rebuttable. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–80, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas. 1912C, 160; City of Hammond v. Schappi Bus Line, Inc., 275 U.S. 164, 170–172, 48 S.Ct. 66, 68, 69, 72 L.Ed. 218; O'Gorman & Young, Inc., v. Hartford Fire Ins. Co., 282 U.S. 251, 256–258, 51 S.Ct. 130, 131, 132, 75 L.Ed. 324, 72 A.L.R. 1163. "It is not a conclusive presumption, or a rule of law which makes legislative action invulnerable to constitutional assault. Nor is such an immunity achieved by treating any fanciful conjecture as enough to repel attack." Borden's Farm Products Co., Inc., v. Baldwin, 293 U.S. 194, 209, 55 S.Ct. 187, 192, 79 L.Ed. 281.

"A state may not, under the guise of protecting the public, arbitrarily interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them." Burns Baking Co. v. Bryan, 264 U.S. 504, 513, 44 S.Ct. 412, 413, 68 L.Ed. 813, 32 A.L.R. 661. See, also, Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 38 L.Ed. 385; Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 29 A.L.R. 1446.

"If the means employed have no real, substantial relation to public objects which government may legally accomplish,—if they are arbitrary and unreasonable, beyond the necessities of the case,—the judiciary will disregard mere forms, and interfere for the protection of rights injuriously affected by such illegal action." Chicago, B. & Q. Ry. Co. v. Illinois, 200 U.S. 561, 593, 26 S.Ct. 341, 350, 50 L.Ed. 596, 4 Ann.Cas. 1175.

A reading of the cases above referred to makes it very apparent that the difficulties which the courts have had in dealing with state statutes of the character here involved arise out of a desire to accord to the states the greatest possible latitude in the exercise of their police power, without, at the same time, nullifying rights guaranteed by the due process and equal protection clauses of the Fourteenth Amendment, U.S.C.A. Const. Amend. 14.

The two questions which we are called upon to answer are:

1. Does the policy declared by the Act bear a reasonable relation to a proper public purpose, or is it palpably in excess of legislative power?

2. Are the means provided for the enforcement of the policy declared by the Act arbitrary and unreasonable?

█ In order to answer these questions, it is necessary to determine what the controlling facts are. These facts are to be ascertained from the evidence, from what is within the range of common knowledge, and from what is otherwise plainly subject to judicial notice. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 79, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160.

This Act did not originate from conditions peculiar to North Dakota, but grew out of a nation-wide controversy of long standing between independent or unaffiliated motion picture exhibitors and those producer-distributors who had entered the exhibition field through acquiring theatres or interests in theatres. The independent exhibitors, through their trade association, caused the Act to be drafted, and sponsored it before the North Dakota legislature. Its introduction in the legislatures of other states was procured, but apparently North Dakota is the first state which has adopted it.

The motion picture industry has three branches: (1) production—the photographing of dramas, photoplays, etc., and the making of positive prints thereof for the purposes of exhibition; (2) distribution—the licensing of prints for public exhibition, and their delivery to and return by licensees; (3) exhibition—the public showing of such films in theatres for an admission charge. In the beginning the three branches were independent of each other. The first move to combine exhibition and production seems to have occurred in or about 1917, when a group of exhibitors operating important theatres in many large cities of the country organized a corporation called First National Exhibitors' Circuit, Inc., which at first, for the benefit of its members, undertook the dis-

tribution to them of motion pictures procured from producers, and later itself went into the business of producing motion pictures, which the exhibitors who had organized First National contracted to use. The predecessor of Paramount, at that time engaged exclusively in the production end of the industry, regarded the entry of the exhibitors into the production field as a menace, and, in order to maintain the market for its pictures, began to purchase theatres and interests in theatres. Other large producers thereafter entered the exhibition field in the same way, and combined production, distribution and exhibition. The exhibitors who had organized First National did not remain in the production field, and that company was eventually acquired by Warner Bros. Pictures, Inc., one of the present major producers of motion pictures. There are now eight of these major producers in the United States. They distribute upwards of 65% of all feature pictures (those of 5,000 feet or more in length) exhibited. These pictures constitute the better pictures released by all producers. There are a few independent producers, whose pictures are known to the trade as "Western" or "action" pictures and are regarded as inferior box-office attractions. No single major producer releases enough pictures in any one year to supply the needs of any single exhibitor, and, almost without exception, an exhibitor, to operate a theatre successfully, must be able to purchase all of the pictures produced by two or more of the major producers.

The independent exhibitors have resented and protested against the entry of the producers into the exhibition field, and have regarded their acquisition of theatres as unfair and unjust competition. The independent exhibitors believe that the acquisition and operation of motion picture theatres by the major producers has created a situation which, if permitted to continue, may eventually destroy the independent theatre operators, and leave the theatres affiliated with producers in virtually complete possession of the field of exhibition. The defendants introduced evidence showing the extent and nature of the controversy which has existed between the independent exhibitors and the producer-distributors owning theatres, which tends to prove that the independent theatre owner is at a disadvantage in competition with affiliated theatres. The producers, on the other hand, deny that they have been guilty of any unfair practices in the distribution of their films, or of any attempts to acquire a monopoly in the business of exhibition either in North Dakota or elsewhere; and their evidence tends to sustain their contentions in that regard.

Paramount's predecessor was apparently the first producer to invade the exhibition field. In 1930 it had some 836 affiliated theatres. It now has about 1,300 theatres. The total number of affiliated theatres in the United States is at present approximately 2500, out of a total of about 16,000 theatres. Five major producers have theatres or interests in theatres. These theatres constitute many, if not a majority, of the best theatres in the larger cities of the United States. There are 168 motion picture theatres in North Dakota, 10 of which are affiliated with Paramount. There are no other affiliated theatres in the State. The total number of seats in all theatres in North Dakota is 46,606; the total number of seats in the affiliated theatres in North Dakota is 7,792. In the four principal cities of North Dakota in which affiliated theatres operate, there is a total of 16 theatres, of which the plaintiffs operate 10. In Fargo, independent theatres have 1,050 seats, and the three affiliated theatres 3,044 seats; in Grand Forks, independent theatres have 1,442 seats, and the two affiliated theatres 1,681 seats; in Jamestown, independent theatres have 400 seats, and the two affiliated theatres 1,130 seats, and in Minot, independent theatres have no seats, and the three affiliated theatres 1,937 seats.

While the plaintiffs' theatres are only about one-seventeenth of all North Dakota theatres, they have more than one-sixth of the entire seating capacity of all theatres in the State, and more than 70% of the total number of seats in all of the theatres in the cities of North Dakota where they operate.

In Minnesota, North Dakota, South Dakota, and in the cities of Superior, Eau Claire and LaCrosse, Wisconsin, there are 964 theatres, with a total of 355,776 seats. Plaintiffs Minnesota and American operate 101 of these theatres, with a total of 86,373 seats. Thus they operate in that territory less than one-ninth of all the theatres, and have approximately one-fourth of the entire seating capacity. In the territory in which Minnesota and American operate, there are no theatres affiliated with any producer other than Paramount, except two "Fox" theatres in Minneapolis, which are managed by Paramount.

Paramount has large resources, its assets as of January 1, 1938, being valued at

approximately $120,000,000, and its gross income for the year 1937 being approximately $100,000,000. The business of production, in which it is engaged, is an expensive, somewhat speculative but lucrative, business. Paramount and other major producers belong to a trade association known as Motion Picture Producers & Distributors of America, Inc.—called in the trade the Hays Association. There is vigorous competition among all producers in the production of pictures. While there is no evidence that the producers who have affiliated theatres have an agreement or understanding that none of their number shall enter the competitive territory in which another of them has theatres, they apparently have refrained from competing with each other in the exhibition field.

Motion pictures are distributed from branch offices maintained by the major producers in 32 large cities of the United States. Minneapolis serves the territory in which Minnesota and American operate. Pictures are not sold to exhibitors; they are leased or licensed for exhibition under yearly contracts providing for a fee or rental which may be either a flat charge or a percentage of the box-office receipts from the particular picture shown. Upon completion of the exhibition of any picture, the picture is returned to the film exchange. The revenue derived from the exhibition of a picture depends largely upon its newness. The largest, best equipped, and best located theatres, which charge the highest admission prices, usually have the first right to exhibit, or the first run, and are known as first-run theatres. The value of the right to exhibit a picture first run depends also upon the length of time which will elapse between the first exhibition and the subsequent exhibition of the same picture in the same competitive area. This lapse of time is called, in the trade, "protection" or "clearance". The amount of clearance granted to an exhibitor by a producer is covered by the license agreement. There are never enough positive prints of any picture to enable all exhibitors to exhibit the same picture at the same time. Two hundred to 350 positive prints are made. These prints must serve from 9,500 to 11,000 theatres. Through clearance and other arrangements, the distributors must be able to furnish each theatre a positive print for exhibition in accordance with the license agreement entitling it to show the picture. First and prior-run theatres pay a much larger license fee or film rental than thea-

tres having subsequent exhibition rights. The difference may be as great as $50,000. Subsequent-run theatres pay for their exhibition right an amount which is often a small fraction of the cost of the positive print, which cost runs from $100 for a black and white print to $900 for a technicolor print. The value of a picture to a subsequent-run theatre depends upon the period of clearance which has been granted to prior-run theatres. As pictures grow stale, their value for exhibition purposes decreases. A producer having affiliated theatres has the power to grant to its theatres the right to exhibit first run all pictures produced by it. It has the power to grant to its theatres greater clearance than to their competitors. Its bargaining power for the pictures of other producers which have affiliated theatres is greater than that of a competing independent exhibitor, because producers operating theatres must purchase pictures from each other, and each of such producers owns many theatres. A producer which owns theatres has the power to make it impossible for the independent exhibitor to procure films from it, and difficult to procure them from other major producers in case the producer-exhibitor desires those films for itself. There is evidence tending to show that producers with affiliated theatres have exercised the powers possessed by them for their own advantage and to the detriment of their independent competitors.

■■■ The Court is not required to determine what would be the best, fairest and wisest solution of the problems and controversies which have come about through the acquisition of theatres by those engaged in the production and distribution of pictures. The wisdom of the policy adopted by the State of North Dakota declaring that affiliated theatres shall not be operated is not for the Court to pass upon.

In fairness, we think it should be pointed out that for eight years Paramount (or its predecessor) has been interested in 10 theatres in the State of North Dakota; that it first acquired its interest in North Dakota theatres from Northwest Theatres, Inc., an independent exhibitor, and that there is no substantial evidence relative to Paramount's conduct of its theatre operations in North Dakota which would seem to justify its exclusion from the State. Conceivably the Legislature might have believed that clearance was greater in communities in North Dakota where affiliated

theatres were operated than elsewhere in the State, and that that might have adversely affected some of the competitors of the affiliated theatres, and might have had some influence upon the prices of admission. The Legislature might, perhaps, have believed that when American leased the Opera House in Jamestown, its entry into that city prevented an independent exhibitor from thereafter securing a contract for Metro-Goldwyn-Mayer pictures. A finding that the plaintiffs had a monopoly in North Dakota or were threatening to obtain one, or had been guilty of any serious abuses with respect to competitors or to the public in North Dakota, would not be justified.

■ We have no doubt, however, that a state legislature, for the purpose of shaping its laws and of guarding against evils which have, or which it may reasonably believe have, developed elsewhere, may look beyond the boundaries of its own state. See Great Atlantic & Pacific Tea Co. v. Grosjean, 301 U.S. 412, 427, 57 S.Ct. 772, 778, 81 L.Ed. 1193, 112 A.L.R. 293; Hammond Packing Co. v. Arkansas, 212 U.S. 322, 343, 29 S.Ct. 370, 53 L.Ed. 530, 15 Ann.Cas. 645.

■ The power of a legislature to deal with practices and situations which may reasonably be conceived to be promotive of monopoly and restraints of trade, is not subject to question. National Cotton Oil Co. v. Texas, 197 U.S. 115, 129, 25 S.Ct. 379, 49 L.Ed. 689; Crescent Cotton Oil Co. v. Mississippi, 257 U.S. 129, 137, 42 S. Ct. 42, 44, 66 L.Ed. 166. While the case last cited is not in all respects analogous to this case, it is at least extremely persuasive of the existence of the power of a state legislature to enact such a law as that here involved, "in the exercise of its police power, to prevent a practice conceived to be promotive of monopoly with its attendant evils." The State of Mississippi had passed an act (Laws Miss.1914, c. 162) prohibiting any corporation interested in the manufacture of cotton-seed oil or cotton-seed meal from operating a cotton gin. It was assumed in that case "that the statute assailed was enacted in aid of the anti-trust laws of the state, under the conviction on the part of the Legislature that it was the practice of corporations operating oil mills and cotton gins to depress the price of ginning, regardless of cost, until local competition was suppressed, or brought to terms, and then to charge excessive prices

for ginning and to pay unfairly low prices for seed." The Supreme Court said that there was evidence in the record tending to show resort to such practices by the plaintiff in error. This statute had been attacked upon the ground that it imposed a direct burden on interstate commerce and denied to the plaintiff the equal protection of the laws because it did not apply to individuals as well as corporations. The Supreme Court sustained the validity of the law as a proper exercise of the police power of the state.

In these cases the plaintiffs deny that they have suppressed local competition or attempted to control prices, and their main attack upon the Act in suit is that it violates due process. In the respects pointed out, these cases differ from the Crescent Cotton Oil Co. Case, but there is evidence in the record here which justifies an inference of suppression of local competition in states other than North Dakota by producers having affiliated theatres; and the evidence also discloses the existence of the power and the temptation of such producers to engage in practices promotive of monopoly and restraint of trade.

It is our opinion that the existence of unusual power to deal with competitors unfairly, when coupled with the opportunity and the temptation to use that power, is probably a sufficient basis for legislative action to prevent the possibility of its exercise. This must certainly be so where there is, in addition, evidence of past aggressions.

In United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999, the Supreme Court reversed an order modifying a consent decree entered in 1920 in a suit under the Sherman Anti-Trust Law, 15 U.S.C.A. §§ 1–7, 15 note. The consent decree, among other things, enjoined Swift & Co. and Armour & Co., meat packers, from dealing as wholesalers and retailers in groceries. In 1930 they applied for a modification of the decree, in order that they might deal in groceries. The lower court modified it so as to permit them to enter the business of selling groceries at wholesale. On appeal, the Supreme Court pointed out that one reason stated in the bill of complaint to justify the injunction was that the defendants in that case had followed the practice of fixing the prices for groceries so low over temporary periods of time as to eliminate competition by rivals less favorably situated. The Court

said (pages 116, 117 of 286 U.S., page 463 of 52 S.Ct.):

"Whether the defendants would resume that practice if they were to deal in groceries again, we do not know. They would certainly have the temptation to resume it. Their low overhead and their gigantic size, even when they are viewed as separate units, would still put them in a position to starve out weaker rivals. Mere size, according to the holding of this court, is not an offense against the Sherman Act [15 U. S.C.A. §§ 1-7, 15 note] unless magnified to the point at which it amounts to a monopoly (United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; United States v. International Harvester Co., 274 U.S. 693, 708, 47 S.Ct. 748, 71 L.Ed. 1302), but size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past. The original decree at all events was framed upon that theory. It was framed upon the theory that, even after the combination among the packers had been broken up, and the monopoly dissolved, the individual units would be so huge that the capacity to engage in other forms of business as adjuncts to the sale of meats should be taken from them altogether. It did not say that the privilege to deal in groceries should be withdrawn for a limited time, or until the combination in respect of meats had been effectually broken up. It said that the privilege should be renounced forever, and this whether the units within the combination were acting collectively or singly. The combination was to be disintegrated, but relief was not to stop with that. To curb the aggressions of the huge units that would remain, there was to be a check upon their power, even though acting independently, to wage a war of extermination against dealers weaker than themselves. * * *

"We have said that the defendants are still in a position, even when acting separately, to starve out weaker rivals, or at least that the fear of such abuses, if rational in 1920, is still rational today."

In speaking of the advantages which the defendants in that case would have as compared with other wholesale grocers, the Court said (page 118, 52 S.Ct. page 463):

"When they add groceries to meats, they will do so, they assure us, with substantially no increase of the existing overhead. Thus in the race of competition they will be able by their own admission to lay a handicap on rivals overweighted at the start."

While the case just referred to differs in many respects from these cases, and relates to the propriety of modifying a consent decree, the reasoning resorted to indicates to us that legislative as well as judicial action to curb what may honestly be believed to be monopolistic tendencies can be based upon a reasonable and justified fear that a powerful corporation or group of corporations possessing the power to unjustly handicap competitors, and faced with the temptation to use that power, may do so if not prevented.

The Legislature of North Dakota apparently had before it all of the facts and circumstances which tended to show that the combining of production, distribution and exhibition of motion pictures created advantages which no independent exhibitor could possess, and placed those who had combined these three branches of the industry in a position to destroy or injure competition. The Legislature also apparently had before it the facts which the producers contend indicate that, even if they have these advantages, they have not used them, and that the market for motion pictures is still virtually a free and open market. We think that the question of the necessity of a law to prevent the coming into existence in North Dakota of unfair competitive practices asserted to have occurred elsewhere and of restraints of trade in the business of exhibition of motion pictures was a matter for the Legislature to decide, and that its determination of this question, under the circumstances, is conclusive upon this Court.

The fact that the Act here in question was passed primarily in the interests of a class would not render it invalid. In Nebbia v. New York, supra, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, the state statute there under consideration dealt primarily with those engaged in a single industry. The same was true in the case of Borden's Farm Products Co. v. Ten Eyck, 297 U.S. 251, 56 S.Ct. 453, 80 L.Ed. 669. There can be no doubt of the right of a state, within constitutional limits, to protect and foster any industry within its borders and to pass reasonable legislation in the interests of its citizens who are engaged in that industry. Moreover, in the Nebbia Case (pages 524, 525 of 291 U.S., page 510 of 54 S.Ct.) the Supreme Court

pointed out that "no exercise of the private right can be imagined which will not in some respect, however slight, affect the public; no exercise of the legislative prerogative to regulate the conduct of the citizen which will not to some extent abridge his liberty or affect his property."

 Our conclusion is that the policy declared by the Act in suit has a reasonable relation to a proper legislative purpose.

 There is, no doubt, force in the plaintiffs' contention that the Act goes beyond the necessities of the situation with which the Legislature was dealing. As already pointed out, the plaintiffs had operated 10 theatres in the State for some eight years. It can reasonably be believed that an act which would have prevented the operation of any more affiliated theatres in the State would have served every useful purpose. Such a law, however, might have been challenged on the ground that it was subject to the same infirmity as the statute which was held invalid in Mayflower Farms v. Ten Eyck, 297 U.S. 266, 56 S.Ct. 457, 80 L.Ed. 675, for discriminating between those entering a business before April 10, 1933, and those entering the business afterwards. However that may be, the Legislature was certainly primarily the judge of what means should be used to secure the enforcement of the economic policy which it had adopted. Had there been no affiliated theatres in the State, the Act prohibiting the operation of any affiliated theatre could hardly have been regarded as harsh or oppressive. If it was within the police power of the State to exclude affiliated theatres before any had come into existence, it was within its power to prevent the operation of such theatres after they had come into existence. The fact that the theatres here involved were acquired before their operation was forbidden could not limit or restrict the police power of the State. Mugler v. Kansas, 123 U.S. 623, 669, 8 S.Ct. 273, 31 L.Ed. 205. Moreover, while this Act deprives the plaintiffs Minnesota and American of the right to operate their theatres in North Dakota so long as Paramount has any interest in them, it does not in reality destroy the value of the investment nor take away the right to operate the theatres as theatres if Paramount shall divorce itself from any interest in them.

Laws requiring the divorcement of certain classes of business are not a novelty in this country. Congress has prohibited carriers from transporting coal produced by companies in which the carrier has an interest. United States v. Delaware & Hudson Co., 213 U.S. 366, 29 S.Ct. 527, 53 L. Ed. 836; United States v. Lehigh Valley R. Co., 220 U.S. 257, 31 S.Ct. 387, 55 L.Ed. 458. Congress has exercised the power (delegated it to a commission) to require certain corporations engaged in interstate commerce to divorce themselves of stock in subsidiary corporations. Federal Trade Commission v. Western Meat Co., 272 U. S. 554, 47 S.Ct. 175, 71 L.Ed. 405. The State of Mississippi, as already pointed out, enacted a law to prevent corporations engaged in manufacturing cotton-seed oil and meal from operating cotton gins. Crescent Cotton Oil Co. v. Mississippi, supra, 257 U.S. 129, 42 S.Ct. 42, 66 L.Ed. 166. The State of Arkansas passed an act, Acts Ark. 1905, p. 1, providing that corporations engaged in a combination or trust outside the State should not do business within the State. Hammond Packing Co. v. Arkansas, supra, 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530, 15 Ann.Cas. 645. These enactments have been sustained. Congress recently enacted laws separating the businesses of banking and investment. 48 Stat. 162, 188, 12 U.S.C. § 377, 12 U.S.C.A. § 377. By the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 et seq., 15 U.S.C.A. § 79 et seq., Congress provided for the disintegration of the public utility holding company systems. States have passed legislation divorcing the businesses of banking and investment, and laws prohibiting manufacturers and wholesalers of whisky from engaging in or having any interest in liquor retail stores. Grain warehousemen are forbidden in Illinois from engaging in grain trading. Central Elevator Co. v. People, 174 Ill. 203, 51 N.E. 254, 43 L.R.A. 658.

 That we might be of the opinion that the Legislature of North Dakota could have dealt adequately with the problem sought to be solved by this challenged legislation in some different or more moderate way, would not justify us in striking down this Act as being harsh and unreasonable. If the subject matter of the legislation was within the legislative authority, the policy declared and the means of its enforcement were, within very broad limits, for the Legislature to decide.

 After due consideration of the record in this case and of the excellent arguments and briefs of counsel, we are of the opinion

that the plaintiffs are not entitled to a declaration that Chapter 165 of the Laws of North Dakota for 1937 is violative of any provision of the Constitution of the United States, and that the defendants are entitled to a decree dismissing the suits.

We are filing herewith Findings of Fact and Conclusions of Law in compliance with Equity Rule 70½, 28 U.S.C.A. following section 723. The defendants, upon reasonable notice to the plaintiffs, may present a form of decree. In the event of an appeal, we think the present status should be preserved until the ultimate decision of the cases by the Supreme Court. The plaintiffs may apply for supersedeas, if so advised.