BAYSIDE FISH FLOUR CO. *v.* GENTRY ET AL.

No. 2. Argued February 12, 1936.—Decided March 2, 1936.

*Mr. Walter Slack* argued the cause and *Mr. Roy Daily* filed a brief for appellant.

*Mr. Darwin Bryan* for appellees.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This is a suit brought to enjoin appellees, officers of the State of California, from enforcing certain provisions of the State Fish and Game Code (Statutes of 1933, pp. 394, 484 *et seq.*) alleged to contravene the commerce clause, and the due process and equal protection clauses of the Fourteenth Amendment, of the Federal Constitution. The court below sustained a motion to dismiss the bill, on the ground that it did not state facts sufficient to constitute a cause of action or to entitle appellant to any relief by injunction or otherwise. 8 F. Supp. 67. We are of opinion that this decree must be affirmed.

Appellant is a California corporation engaged in the business of manufacturing, from the meat of sardines, fish flour for human consumption. The sardines are caught by fishermen upon the high seas beyond the three-mile limit to which the jurisdiction of the state extends, sold to appellant, and brought into the state and there reduced to fish flour at appellant's reduction plants. The fish flour is made with the expectation of selling

and shipping it in interstate and foreign commerce; and it is so sold and shipped and is used as food in the United States and foreign countries. Sardines are a migratory fish found in great numbers in the Pacific Ocean beyond the three-mile limit as well as within that limit. So far as known, they spawn upon the open seas. In the process of reducing the fish, appellant uses a portion for producing flour for human consumption, the remainder being converted into a meal used for chicken feed, and into fertilizer, fish oil and other nonedible substances.

Sardines caught in the same way are also purchased by packers, who clean, cook, and can or preserve them for human food, using in that process only a part of the fish and utilizing the remainder for reduction into nonedible products.

The provisions of the Fish and Game Code which appellees threaten to enforce against appellant and those necessary to be considered in that connection are copied in the margin.[1] The bill alleges that appellees will pre-

---

[1] Sec. 1010. Every person must procure a license for each plant or place of business to engage in the business of:

(a) Canning, curing, preserving or packing fish, taken from the waters of this State or brought into this State in a fresh condition.

(b) Manufacturing fish scrap, fish meal, fish oil, chicken feed or fertilizer from fish or fish offal.

Sec. 1060. As used in this article:

(a) "Reduction plant" means any plant used in the reduction of fish into fish flour, fish meal, fish scrap, fertilizer, fish oil or other fishery products or by-products.

(b) "Packer" means any person canning fish or preserving fish by the common methods of drying, salting, pickling or smoking.

(c) "Fish offal" means the heads, viscera, and other parts of fish taken off in preparing for canning or preserving.

Sec. 1064. It is unlawful to cause or permit any deterioration or waste of any fish taken in the waters of this State, or brought into this State, or to take, receive or agree to receive more fish than can

vent appellant from manufacturing fish flour in its reduction plants while at the same time permitting packers to use sardines, taken from the waters of the state or those outside, in their packing plants.

*First.* There is nothing in the state act to suggest a purpose to interfere with interstate commerce. It in no way limits or regulates or attempts to limit or regulate the

be used without deterioration, waste or spoilage. Except as allowed by this code, it is unlawful to use any fish or part thereof, except fish offal, in a reduction plant or by a reduction process.

Sec. 1065. Sardines may be taken for use in a reduction plant, or by a packer, only in accordance with the provisions of this article, as follows: In districts 4, 4¾, 18, 19, 20, 20A, and 21 between November 1 and March 31; elsewhere in the State between August 1 and February 15. This section does not prohibit the taking of sardines for the purpose of salting, curing, smoking or drying or for the purpose of packing in cans commonly known as quarter-pound or square cans less than 10 ounces in net weight; provided, that in a ten-ounce can, fish of a size of not less than eight fish to the can may be used, and there shall be added to the commonly known quarter-pound can not less than one ounce of olive oil or a commercial salad oil, and a proportionately larger amount of such oil to the larger sizes of cans.

Sec. 1066. Any person engaged in canning sardines may take and use in a reduction plant thirty-two and one-half per cent of the amount of sardines actually received at such canning plant during each calendar month.

Sec. 1068. The commission may grant a revocable permit, subject to such restrictions, rules or regulations as the commission may prescribe, to take and use fish by a reduction or extraction process. No reduction of fish shall be permitted which may tend to deplete the species, or result in waste or deterioration of fish.

Sec. 1070. Persons engaged in preserving sardines by the common methods of drying, salting, smoking or pickling may use in a reduction plant or by reduction process such sardines, or fish delivered mixed with sardines, as are unfit for drying, salting, smoking or pickling, which are not intentionally taken into the plant in a condition unfit for processing for human consumption.

movement of the sardines from outside into the state, or the movement of the manufactured product from the state to the outside. The act regulates only the manufacture within the state. Its direct operation, intended and actual, is wholly local. Whether the product is consumed within the borders of the state or shipped outside in interstate or foreign commerce are matters with which the act is not concerned. The plain purpose of the measure simply is to conserve for food the fish found within the waters of the state. Over these fish, and over state wild game generally, the state has supreme control. Sardines taken from waters within the jurisdiction of the state and those taken from without are, of course, indistinguishable; and to the extent that the act deals with the use or treatment of fish brought into the state from the outside, its legal justification rests upon the ground that it operates as a shield against the covert depletion of the local supply, and thus tends to effectuate the policy of the law by rendering evasion of it less easy. *Silz* v. *Hesterberg,* 211 U. S. 31, 39–40.

If the enforcement of the act affects interstate or foreign commerce, that result is purely incidental, indirect, and beyond the purposes of the legislation. The provisions of the act assailed are well within the police power of the state, as frequently decided by this and other courts. It is unnecessary to do more than refer to *Silz* v. *Hesterberg, supra,* pp. 39 *et seq.,* and *Van Camp Sea Food Co.* v. *Department of Natural Resources,* 30 F. (2d) 111, where the decisions are collected.

Appellant places great reliance upon *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1. There an act of the State of Louisiana forbade exportation of shrimp from which the heads and hulls or shells had not been removed. The ostensible purpose of the act was to conserve the raw shells for local use. The bill and affidavits in support of it, however, demonstrated, we held, that this purpose was

feigned, and that the real purpose was to prevent the shrimp from being moved as theretofore from Louisiana to a point in Mississippi, where they were packed or canned and sold in interstate commerce, and thus through commercial necessity to bring about the removal of the packing and canning industries from Mississippi to Louisiana. The Louisiana act authorized every part of the shrimp to be shipped and sold in interstate commerce. We held that the state might have retained the shrimp for use and consumption therein; but, having fully permitted shipment and sale outside the state, those taking the shrimp under the authority of the act became entitled to the rights of private ownership and the protection of the commerce clause. It is plain that the decision has no application to the case under review.

*Second.* The point that the provisions of the Fish and Game Code deprive appellant of its property without due process of law seems to be based upon the contention that appellant is denied the right to contract for the purchase of sardines taken from the high seas and brought into the state. Assuming the point to have been properly raised below, which is by no means clear, it is without merit. Undoubtedly the right to contract, with some exceptions, is a liberty which falls within the protection of the due process clause of the Fourteenth Amendment. *Adkins* v. *Children's Hospital,* 261 U. S. 525, 545–546, and cases cited. Plainly enough, however, that right is not directly interfered with by the legislative provisions in question. Nor, because they may operate indirectly as a deterrent, do they, in the sense of the Constitution, deprive appellant of the liberty of contract. A statute does not become unconstitutional merely because it has created a condition of affairs which renders the making of a related contract, lawful in itself, ineffective.

These provisions have a reasonable relation to the object of their enactment—namely, the conservation of the

fish supply of the state—and we cannot invalidate them because we might think, as appellant in effect urges, that they will fail or have failed of their purpose. *McLean* v. *Arkansas,* 211 U. S. 539, 547–548. Nor can we declare the provisions void because it might seem to us that they enforce an objectionable policy or inflict hardship in particular instances. *Chicago, B. & Q. R. Co.* v. *Nebraska,* 170 U. S. 57, 77. And see, generally, *Chicago, B. & Q. R. Co.* v. *McGuire,* 219 U. S. 549. "Whether the enactment is wise or unwise," this court said in that case (p. 569), "whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative discretion within its prescribed limits should be exercised in a particular manner, are matters for the judgment of the legislature, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance."

*Third.* Finally, it is said that the provisions of the state code so discriminate between the business of appellant and that of persons engaged in canning or preserving fish, as to deny appellant the equal protection of the laws. Section 1010, *supra,* requires a license for each plant or place of business to engage in (a) canning, curing, preserving or packing fish, etc., and (b) manufacturing fish scrap, fish meal, fish oil, chicken feed or fertilizer from fish or fish offal. Section 1060 defines "reduction plant" as a plant used in the reduction of fish into fish flour, fish meal, fish scrap, fertilizer, fish oil, or other fishery products or by-products; and defines "packer" as any person canning fish or preserving fish by the common methods of drying, salting, pickling or smoking. Section 1064 is a provision intended to prevent deterioration or waste of fish, and specifically provides that, except as allowed by the Code, it shall be unlawful to use any part of the fish except the offal in a reduction plant or by a reduction process. By § 1065,

sardines are allowed to be taken for use in a reduction plant or by a packer only in accordance with certain provisions set forth. By § 1068, the State Fish and Game Commission is authorized to grant a revocable permit "subject to such restrictions, rules or regulations as the commission may prescribe, to take and use fish by a reduction or extraction process. No reduction of fish shall be permitted which may tend to deplete the species, or result in waste or deterioration of fish." No similar limitation is put upon, or similar power conferred in respect of, packers; and it is the resulting classification which appellant contends contravenes the equal protection clause of the Fourteenth Amendment.

It never has been found possible to lay down any infallible or all-inclusive test by the application of which it may be determined whether a given difference between the subjects of legislation is enough to justify the subjection of one and not the other to a particular form of disadvantage. A very large number of decisions have dealt with the matter; and the nearest approach to a definite rule which can be extracted from them is that, while the difference need not be great, the classification must not be arbitrary or capricious, but must bear some just and reasonable relation to the object of the legislation. A particular classification is not invalidated by the Fourteenth Amendment merely because inequality actually results. Every classification of persons or things for regulation by law produces inequality in some degree; but the law is not thereby rendered invalid (*Atchison, T. & S. F. R. Co.* v. *Matthews,* 174 U. S. 96, 106), unless the inequality produced be actually and palpably unreasonable and arbitrary. *Arkansas Natural Gas Co.* v. *Railroad Commission,* 261 U. S. 379, 384, and cases cited.

The purpose of the legislation under consideration is to prevent unnecessary waste, and to conserve for food the fish supply subject to state jurisdiction. See *People*

v. *Monterey Fish Products Co.,* 195 Cal. 548, 557–559. If the legislature was of the view—as evidently it was—that the process of packing on the whole would not interfere with the effectuation of this policy while the process of reduction would do so, unless carefully limited to prevent excessive operations, we are unable to perceive any reason for saying that such view was without reasonable basis. By the process of packing—that is, canning or preserving—fish, the original form of the edible portions of the fish is not destroyed as it is by the process of reduction, by which those portions are broken down into a loose meal or flour. In the latter case it is obvious that the product may be readily diverted to other purposes than human consumption, such as chicken feed, fertilizer, etc. It is equally obvious that such a diversion is not likely to happen in the case of canning or preserving, where the edible portions retain their original solid form. The state also points out that the process of reduction is simple, and the quantity which can be reduced in a given period of time greatly exceeds what can be utilized by packing, which is a much slower and more complicated process. These differences are enough to bring the classification within the permissible range of state power, so far as the equal protection clause of the Fourteenth Amendment is concerned.

We have considered the arguments of appellant tending to a different conclusion than that which we have reached; but at most these arguments do no more than demonstrate that the question is debatable. And, if so, the effect of the action of the state legislature in passing the statute was to decide this debatable question against the view now advanced by appellant; and since we are unable to say that such a determination by the legislature is clearly unfounded, we are precluded from overturning it. *Radice* v. *New York,* 264 U. S. 292, 294.

*Decree affirmed.*