MANAKA v. MONTEREY SARDINE
INDUSTRIES, Inc., et al.
No. 21772.

District Court, N. D. California, S. D.
Oct. 20, 1941.

Single, Bryant, Cook and Hays, of San Francisco, Cal., for plaintiff.

Hudson, Martin & Ferrante and Webster Street, all of Monterey, Cal., for defendants other than Del Mar Canning Co.

John Milton Thompson, of Monterey, Cal., for defendant Del Mar Canning Co.

Russell Zaches, of Monterey, Cal., for third party defendant, Seine & Line Fishermen's Union et al.

JAMES ALGER FEE, District Judge.

This case is brought by Frank Manaka against the Monterey Sardine Industries, Inc., certain members thereof as officers and individuals, and the Del Mar Canning Company, to recover triple damages, because of an alleged conspiracy to restrain him from fishing and marketing his products so obtained at Monterey, California. An outline of pertinent facts in evidence follows:

Frank Manaka, an American citizen of Japanese extraction, made a contract to fish for the Del Mar Canning Company at Monterey for the season of 1940. The name of the boat was left blank in the contract which was dated February 20, 1940. The reason for this omission was that Manaka intended to obtain a boat later. The first boat chartered by him was the "Zephyr", which became useless by reason of an explosion. He then obtained the "New Ambassador", which was later requisitioned by the United States. Finally, Manaka chartered the "Ocean Gift" from her owner at San Pedro, and brought her into the harbor at Monterey in accordance with his contract with the canner. He was not permitted to fish there during that season, although one boatload of fish which he caught was finally disposed of after a series of complications. He made an earnest effort by negotiations with members of the association and the canning company, personally and by his attorney, to have his contract recognized. Manaka returned to San Pedro harbor and fished there during the balance of the season, with the expressed purpose of minimizing damages. Action was then brought.

The Monterey Sardine Industries, Inc., moved to have the Seine and Line Fishermen's Union, Monterey Branch, joined as a third party defendant in the action. This was done, and the Union answered. At the beginning of the trial, however, plaintiff disclaimed any desire to ask relief against that defendant so impleaded, as

did Monterey Sardine Industries, Inc., and Del Mar Canning Company. Thereupon, on motion of the Union asking dismissal of the action as to it, the court dismissed the Union from the case.

It was agreed at the preliminary conference that the sole question for trial was, as to who, if anyone, prevented Manaka from fishing in the vicinity of Monterey and marketing the fish there.

In this type of case, the scenery either conceals or gives character to the action. A combination to restrain commerce between the states or with foreign nations is not usually evidenced by contracts under seal. The existence thereof must be discovered by an inspection of the surrounding circumstances.

It should be determined, first, what the nature of the business is; second, what if any control is exercised by the Monterey Sardine Industries, Inc., and finally, whether such control of the business is lawful.

The historic Bay of Monterey on the coast of California has always been famous for its fisheries, which in recent years have been developed into an industry of considerable proportions. There have been erected on the Bay a number of canneries. Formerly, these plants operated without regulation. For some years, however, the State of California has, by legislation, exercised supervision and control over the canneries and reduction plants in order to conserve this important food supply. Although the constitutionality of such regulation was hotly contested, it is now settled that these measures of control do not constitute an interference with interstate commerce.[1] The canneries and reduction plants, therefore, operate under license and strict supervision.

The evidence shows that the bulk of fish canned and the products of the reduction plants at Monterey go into interstate commerce. These canning or reduction plants at Monterey process practically all the fish caught in California waters and on the high

seas adjacent to Monterey. It may be also concluded that no other market is practicable or available for such fresh fish in quantities.

Fish are caught where they are found. Thus, a considerable proportion of the fish processed at Monterey come from the high seas. When a fishing boat goes out on the high seas from Monterey and fishes thereon, she commingles with the vessels and is subject to the laws established by agreement of the commercial nations of the world. When she brings these products into the territorial waters of the United States, she is engaged in commerce with foreign nations.[2]

■ No purely local situation, such as the regulation of canning or reduction of fish at Monterey in California, is thus involved. The transportation by vessels, which intermingle while fishing with ships of foreign nations, of considerable quantities of fish from the high seas into the State of California is the gist of the controversy.[3] Even though fishing in coastal waters might be likewise restrained, an interference with this transportation from the high seas by closing the market would be a direct restraint upon foreign commerce.[4]

Second, the Monterey Sardine Industries, Inc., is a co-operative association of owners of boats which fish in the vicinity of the Bay.[5] The association markets all of the fish caught by its members and others which come into the Port of Monterey. By negotiations with the canners and the unions, the association sets the price at which the fish are to be sold. Furthermore, the association has a series of contracts with each canning or reduction plant at Monterey or vicinity. Such contracts cover the relations for a series of years and outline in great detail the dealing between the association and the individual canner. The terms of such contracts vest the control of the industry in the boat owners association,

[1] Van Camp Sea Food Co. v. Department of Natural Resources, D.C., 30 F.2d 111; Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 772.

[2] Lord v. Goodall, N. & P. Steamship Co., 102 U.S. 541, 26 L.Ed. 224; The Abby Dodge v. United States, 223 U.S. 166, 32 S.Ct. 310, 56 L.Ed. 390.

[3] United States v. Brims, 272 U.S. 549,

552, 553, 47 S.Ct. 169, 170, 71 L.Ed. 403. "It is a matter of no consequence that the purpose was to shut out non-union millwork made within Illinois, as well as that made without."

[4] See C. E. Stevens Co. v. Foster & Kleiser Co., 311 U.S. 255, 61 S.Ct. 210, 85 L.Ed. 173.

[5] See Title 15 U.S.C.A. § 521.

534

owing to the provision in all of these agreements to the effect that the canners agree to purchase all sardines from this defendant and from no one else. The evidence indicates that by virtue of these contracts and its relations with the unions, the organization does exercise effective monopolistic control over the business and over all fish caught in the Bay of Monterey and in coastal waters and the high seas in the vicinity.

The avowed purpose of the association is to limit the right to fish as far as possible to local boat owners, to assure each of them a profit and to maintain the price of fish.

The boat owners association does not sell the fish in bulk to the canners, but reserves the right to "assign" to each canning company a limited number of vessels specified by name in the yearly renewal agreements, which vessels are to supply that particular cannery with fish during a season. But the association does not agree that such vessels will catch a sufficient quantity of fish to keep the cannery in operation. The interest of the canner, therefore, is to obtain as many boats in the hands of competent fishermen as possible in order that the cannery may operate at capacity. The interest of the boat owners is that as few boats as possible fish, but particularly that boats owned by members of the association supply the fish to the canners. Vessels not locally owned are called "outside" boats. It is clear that the more "outside" boats there are fishing, the fewer local boats will be employed. The canners, on account of their interest, suggest and sometimes battle for their choice of boats and apparently, at times, try to have "outside" boats which are handled by competent fishermen. To this end the canner makes contracts with the masters or persons in charge of boats early in the year in order to secure the use of such boats for the next season. But the boat owners association finally "assigns" the vessels, and if the canner should have out too many contracts, the association could refuse to permit certain boats already under contract with the canner to operate, because the canner is bound to buy fish from no one but the association.

■ Third, the associations authorized to do business as marketing agencies of aquatic products[6] are not in themselves illegal combinations, but the mere fact that the Secretary of Commerce has not acted under the provisions of the statute permitting him to control monopoly does not indicate that a combination may not actually exist in violation of the statute.[7]

■ Such an association as that of the boat owners is not freed from the restrictive provisions of the anti-trust act, because they profess in the interest of the conservation of important food fish to regulate the price and the manner of taking such fish "unauthorized by legislation and uncontrolled by proper authority". "Surely reasonable men will agree that the public's interest in an important item of food supply should not be put in such jeopardy. If an exclusive and monopolistic arrangement * * . * can be legally made as to fish, it can be made as to milk, as to meat, and as to other necessities of life", as my colleague, Judge McColloch, has so well said in the case of Columbia River Packers Ass'n v. Hinton, D.C., 34 F.Supp. 970, 975.

■ This brings up the ultimate question of whether defendants did prevent Manaka from fishing and marketing the fish.

Manaka unquestionably desired to fish in the harbor of Monterey. His conduct in entering the contract with the Del Mar Canning Company early in the season and in hiring three vessels, one after the other, indicates that. He offered to pay back dues of his father, who was a former member of the association, and sought both personally and through his attorney to obtain permission to fish. It is probable that if Manaka had been on the ground at the time that the final contract was signed between Del Mar Canning Company and the Monterey Sardine Industries, Inc., wherein the boats were assigned to that cannery, the "Ocean Gift" would have been mentioned therein and the cannery could have forced his employment, but probably would have been required to make other concessions. As it was, Mr. David, President of the Del Mar Canning Company, in order, apparently, to get sufficient capacity for his cannery, insisted on fishing his own

---

6 15 U.S.C.A. § 522.

7 United States v. Borden Company, 308 U.S. 188, 206, 60 S.Ct. 182, 80 L.Ed. 181.

vessel, the "Santa Rosalia", which was also an "outside" boat. But Manaka did not arrive at Monterey until October eleventh, five days after this contract was signed. The Del Mar Canning Company professed to be willing to recognize the Manaka contract and to permit Manaka to fish for it, in accordance therewith, and did designate the "Ocean Gift" as one of its vessels, but this designation was never formally and directly made to the Monterey Sardine Industries, Inc. It is obvious that Del Mar Canning Company was under pressure and feared that if the "Ocean Gift" were directly designated that the boat owners would punish Del Mar Canning Company by taking away one of the other boats and refusing to permit it to fish. On the other hand, Del Mar Canning Company could not buy fish from Manaka without an "assignment" of the "Ocean Gift" to that cannery by the association. The contract bound the cannery to buy fish from the association and no one else. The only method by which fish were bought from the association was by accepting them from one of the "assigned" vessels. The real reason that Manaka could not fish was because the "Ocean Gift" was not "assigned" to Del Mar Canning Company. This was not by mere inaction upon the part of the association, but was positive action by the "assignment" of vessels under the monopolistic system of contracts, and the failure to include Manaka therein. The association was under no obligation to get employment for Manaka and his boat with Del Mar Canning Company, but he already had a contract with that company. His "assignment" would have given the Del Mar Canning Company eleven boats, however, and lessened the control by the association, while some boats owned by members of the association were "on the beach".

The net result was that Manaka could not fish at Monterey. The negotiations point the finger directly at the members of the association as the cause. Eventually, arrangements were made so that Manaka could unload and sell one boatload of fish, but not even this, at the Del Mar plant. The tacit understanding seems to have been that if these fish were cleared Manaka would leave Monterey, which he did. After he had gone to San Pedro, the association (without admitting liability!) offered to let him come back to fish after one of the "assigned" boats had been disabled.

Manaka suffered loss as a direct result of these acts.

There was a persistent attempt to bring the case in the category of a "labor dispute". Although the court dismissed the action against the Union because no other party claimed relief against it, the conduct of Mr. Alioto, its manager, should be considered in determining whether the Union was the cause of the denial of the right to fish to Manaka.

Mr. Alioto played a prominent part in preventing the unloading of the one boatload of fish caught by Manaka. The reason assigned was that the crew of the "Ocean Gift" had not been cleared by the Union before going fishing. But the members of Manaka's crew could have been properly certified because they carried a certificate from the local at San Pedro, or other members of the Monterey local could have been put in their places. The crucial objection according to Alioto was that the boat did not have a "job", and that there were other locally owned boats which were not fishing. Thus, if the "Ocean Gift" had been "assigned" to Del Mar Canning Company by the association, all essentials would have been satisfied and no objection, upon meeting of proper formal requirements, would have been made. If the Union did actually prevent Manaka from fishing, and there seems to have been no action by the Union in its meetings, it is strange there was no mention of such a condition when the Monterey Sardine Industries, Inc., offered to allow him to fish later. But if the Union authorized the action of Alioto, the insistence upon a "job" for the "Ocean Gift" as a condition precedent indicates an entente cordiale between the manager of the Union and the association to the end that Manaka be restrained from fishing until "assigned".

The situation is thus entirely different from that which existed in Hinton v. Columbia River Packers Association, 9 Cir., 117 F.2d 310, where the contest was between the packers of and dealers in fish and the Pacific Coast Fishermen's Union, which was a labor organization. The court held that the controversy was a labor dispute and the court had no jurisdiction to grant an injunction. Here, even if the Union had some part in preventing Manaka

from fishing, the evidence clearly shows that the action was taken because of the attitude of Monterey Sardine Industries, Inc. Clearly, then, the action of the Union cannot assist defendants, because if the Union was acting in co-operation, the situation falls squarely within the principle laid down in United States v. Brims, supra, where the agreement of manufacturers of mill work, building contractors and union carpenters to check competition from non-union-made mill work coming in part from other states, was held to be conspiracy to restrain interstate commerce, notwithstanding the incidental inclusion of intrastate commerce as well. In United States v. Hutcheson, 312 U.S. 219, 233, 61 S.Ct. 463, 467, 85 L.Ed. 788, it is said: "Clearly, then, the facts here charged constitute lawful conduct under the Clayton Act unless the defendants cannot invoke that Act because outsiders to the immediate dispute also shared in the conduct." Here the point of attack was the combination of the members of the boat owners association against Manaka. Whether the Union innocently or by design assisted the accomplishment of the purpose of the members of the boat owners association, the fact cannot avail to absolve the latter.

The court finds for plaintiff on this issue. An appropriate order may be prepared according to stipulation, to refer the assessment of damages to a master, to be agreed upon by the parties, subject to the approval of the court.