**Joseph Q. CIPRIANO, Plaintiff,**

**v.**

**CITY OF HOUMA, G. Leslie Broussard, Mayor, Christian L. Olivier, Charles Davidson, Peter Bourgeois, Jr., Samuel Lusco and Wilbert P. Bonvillian, Defendants.**

**Civ. A. No. 67–1853.**

United States District Court
E. D. Louisiana,
New Orleans Division.

July 15, 1968.

Kenneth T. Watkins, J. Louis Watkins, Jr., James C. Walker, Jr., Houma, La., for plaintiff.

Kenneth C. De Jean, Baton Rouge, La., Sp. Counsel to Atty. Gen., intervenor.

R. Gordon Kean, Jr., Baton Rouge, La., for Louisiana Municipal Assn., amicus curiæ.

E. E. Huppenbauer, Jr., New Orleans, La., Ted J. Borowski, Houma, La., for defendants.

Before WISDOM, Circuit Judge, and RUBIN and COMISKEY, District Judges.

RUBIN, District Judge:

A resident of the City of Houma, Louisiana, has brought a class action seeking an injunction to prevent the City from issuing utility revenue bonds approved by a vote of the property taxpayers at a special election. In addition, he seeks a judgment declaring that the provisions of Louisiana law under which the election was held violate the federal constitution. The plaintiff is a qualified voter, but not a property owner. He contends that he and the other members of the class of resident voters who do not own property in Houma have a proprietary interest in the municipal utility properties and that, since the Louisiana Constitution and statutes permit only qualified resident voters who are property owners to participate in the election, they have been denied due process and equal protection of the laws in violation of the Fourteenth Amendment to the Constitution of the United States.

The Louisiana Constitution imposes limitations on the amount of debt a municipality may incur.[1] But in Louisiana, as in other states, these limitations apply only to debt that constitutes a general obligation of the municipality; debt that is a charge only on a special fund is not subject to the limitation.[2] Article XIV, Section 14(m), of the Louisiana Constitution is typical of the provisions relative to such special funds: it provides that the legislature may authorize municipal corporations to issue bonds for the purpose of constructing, acquiring, extending, or improving any revenue producing public utility if the bonds are secured exclusively by a mortgage on the assets of the utility system and a pledge of its revenues, but that these bonds may not be a charge on the other public income and revenues of the municipality.[3]

Acting under this authority, the Louisiana legislature empowered municipal corporations to issue public utility revenue bonds for the purposes permitted by the constitutional provision.[4] The bonds must be authorized by a resolution of the municipal governing body.[5] As the Louisiana Constitution requires, they must be payable solely from the revenues of operating the utility system, and they may not constitute an indebtedness or pledge of the general credit of the munic-

---

1. LSA–Const. Art. 14, § 14(f).

2. The provisions limiting municipal indebtedness had their origin in the latter half of the 19th Century. Seeking to attract railroads, communities issued bonds and bought railroad stock with the proceeds. The depression of the 1870's rendered most of the stock worthless. Corrupt municipal administration also resulted in indiscriminate issuance of bonds to cover the cost of projects of questionable value. See generally in this regard, De Torres, Financing Local Government 26–27 (1967). See also Fowler, Revenue Bonds 46 (1938); Lutz, Public Finance 594 (1924); McDonald, American City Government and Administration 456 et seq. (1955).

3. Article XIV, Section 14(m) provides expressly that bonds of this nature "shall not be included in computing the indebtedness of the municipality for the purpose of any limitation herein."

4. LSA–R.S. 33:4251.

5. LSA–R.S. 33:4252.

ipality.[6] Before the resolution authorizing the issuance of bonds may be adopted by the governing body, the question whether the bonds should be issued must be submitted to and approved by the votes of a majority in number and amount of the property taxpayers.[7]

The procedure contemplated by the Louisiana statutes was followed by the City of Houma. The Mayor and Board of Aldermen, the duly elected municipal governing body, adopted a resolution calling a special election. The election was held, and the bond issue was approved. The City applied to the State Bond and Tax Board for consent and authority to issue and sell the bonds.[8] Before they can be sold, it will be necessary for the municipal governing body to adopt a resolution for the issuance and sale of the bonds.[9]

While the plaintiff contends he was denied due process of law, he does not seriously press the claim. His real complaint is denial of equal protection of the laws, and he relies entirely upon Harper v. Virginia State Board of Elections, 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L. Ed.2d 169. In *Harper* the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prevents a state from exacting a poll tax as a condition of the right to vote in state elections. Mr. Justice Douglas reasoned that, "[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment." Id. at 665, 86 S.Ct. at 1081. A state "violates the Equal Protection Clause of the Fourteenth Amendment whenever it makes the affluence of the voter or payment of

any fee an electoral standard." Id. at 666, 86 S.Ct. at 1081.

██ But this sweeping proposition is not decisive here. The Equal Protection Clause does not command state legislatures to make their laws conform to hydraulic principles by seeking the common—and lowest—level. "Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary." Walters v. City of St. Louis, 1954, 347 U.S. 231, 237, 74 S. Ct. 505, 509, 98 L.Ed. 660. In considering whether a classification rests on a real difference we must take into account the nature and the relative importance of the subject with respect to which equality is asserted. "Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society. Especially since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 1964, 377 U.S. 533, 561–562, 84 S.Ct. 1362, 1381, 12 L. Ed.2d 506.

But "the Equal Protection Clause is not shackled to the political theory of a particular era," [10] not even the one in vogue at present. It does not forbid the states to fix voter qualifications; it only, as *Harper* puts it, prevents them "from fixing voter qualifications which invidiously discriminate." [11] For "[t]here

---

6. Id.

7. LSA–R.S. 33:4258. The election is also contemplated by the Louisiana Constitution. Art. XIV, § 14(m), which provides, "The Legislature may, in its discretion, require an election by the tax-paying voters of the subdivision or district as a condition precedent to the issuance of such bonds * * *."

8. LSA–R.S. 39:871; 47:1803, 47:1804.

9. LSA–R.S. 33:4252; see LSA–R.S. 33:-4258.

10. Harper v. Virginia State Board of Elections, 1966, 383 U.S. 663, 669, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169.

11. Id. 383 U.S. at 666, 86 S.Ct. at 1081.

can be no doubt either of the historic function of the States to establish, on a nondiscriminatory basis, and in accordance with the Constitution, other qualifications [than residence] for the exercise of the franchise." [12] *Harper* holds merely that equal protection is denied when a state levies a poll tax. It does not declare that the Fourteenth Amendment abrogates the power of the states to classify voters.

Mere classification does not of itself deprive a group of equal protection.[13] Older decisions taught us that legislation that differentiates between two classes is unconstitutional only if the discrimination is irrational, arbitrary or capricious.[14] Only a few weeks ago, the Supreme Court indicated that these principles are still vital. In holding that the one man, one vote principal of Reynolds v. Sims was applicable to the selection of Texas County Commissioners it said, "The Equal Protection Clause does not, of course, require that the State never distinguish between citizens, but only that the distinctions that are made not be arbitrary or invidious." Avery v. Midland County, Texas, 1968, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45.[15]

Unlike the poll tax rejected in *Harper,* the Louisiana statute attacked here does not limit suffrage in an election held to vote for political representatives or general governmental purposes. It deals solely with a vote on the issuance of municipal revenue bonds. The test to be applied is whether the distinction drawn between resident voters who are property owners and resident voters who do not own property is so arbitrary or invidious as to deny equal protection of the laws to the resident who does not own property. This can not be settled by resort to generalizations that would apply the same criteria to every ballot on every subject just because it is a ballot. Whether the distinction is invidious depends on the exact factual situation presented.

Before a utility revenue bond can be issued under the Louisiana constitutional and statutory plan, the property owners election must be authorized by an elected governmental body. The plaintiff has full suffrage in the election of this municipal governing body, as well as in the election of the Louisiana legislature. The property owners election called by the municipal governing body can only approve or disapprove the issuance of bonds. If it disapproves, its veto is decisive. But even if it approves, the municipal governing body has the final decision on whether the bonds should be issued.[16]

The election to approve the issuance of the bonds is not an election for general governmental purposes. It concerns the administrative functions of the municipality. This type of distinction has been considered important in determining what is required to afford equal protection to voters. See Sailors v. Board of Education of County of Kent, 1967, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650.

The question here is not whether all voters resident in a municipality are equally qualified to vote on the issuance of utility bonds, nor whether they are all equally concerned with municipal utility services, nor whether they pay utility bills just like property owners, nor whether the people of Louisiana in adopt-

---

12. Carrington v. Rash, 1965, 380 U.S. 89, 91, 85 S.Ct. 775, 777, 13 L.Ed.2d 675.

13. Williamson v. Lee Optical of Oklahoma, 1955, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563; Carrington v. Rash, 1965, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675.

14. Bayside Fish Flour Co. v. Gentry, 1936, 297 U.S. 422, 429, 56 S.Ct. 513, 80 L.Ed. 772; Arkansas Natural Gas Co. v. Ar-

kansas R.R. Comm., 1923, 261 U.S. 379, 384, 43 S.Ct. 387, 67 L.Ed. 705; Cox, Constitutional Adjudication and the Promotion of Human Rights, 80 Harv.L.Rev. 91, 94–95 (1966).

15. See also Dusch v. Davis, 1967, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656.

16. See, e. g., The Wall Street Journal, vol. XLI, no. 101 (Wednesday, May 22, 1968), p. 21, cols. 1 & 2.

ing their Constitution or the legislature of Louisiana in enacting its statutes have acted wisely in determining that only property owners can veto the issuance of revenue bonds. It is whether Louisiana's plan of governmental action is arbitrary or invidious with respect to the resident voter who owns no property. In deciding how they would authorize revenue bonds to be issued, Louisianians might have supposed, perhaps erroneously but without being irrational, that property owners by and large have a greater and more permanent economic stake in the community than nonproperty owners; that the values of property might be more directly affected by the quality and cost of utility service; that the success of a municipal utility system might yield funds for general municipal operation, relieving property owners of some of the burden otherwise borne by ad valorem taxes, while the failure of such a system might impair the credit of the municipality even though the bondholders have no claim to its funds. They might have recalled that in many cases the cost of installing utility services have been directly borne by subdividers of property.[17] They might have thought that property owners could better take into account such questions involved in utility operation as valuation of property, acquisition of rights of way, and durability of construction. In all of these matters, their conclusion might be different from the ones we ourselves would reach, and the conclusion might be one that cannot be scientifically established or proved by a preponderance of the evidence. But the question is not whether they are right, but merely whether they are so wrong as to be irrational.

As *Sailors* recognized, "Viable local governments may need many innova-

tions, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation." 387 U.S. at 110–111, 87 S.Ct. at 1553.

■ There is no one light to kindle in state and municipal fiscal matters. Indeed, beset as state and local governments are by financial problems,[18] it may be that the gloom is impenetrable. But the legislatures of some states think that giving property owners the right to veto the issuance of revenue bonds serves as a wise fiscal restraint.[19] We cannot say that this conclusion is based on a distinction between those who own property and those who do not that is irrational, arbitrary or invidious. Those who, like the plaintiff, consider the Louisiana legislative provisions unwise have their general franchise unimpaired; they may seek to elect representatives who will vote for what they consider a better method of authorizing the issuance of revenue bonds.

In Kramer v. Union Free School District No. 15, 2 Cir., 1967, 379 F.2d 491, Judges Kaufman and Hays held that a three-judge court should be convened to hear a case in which a bachelor who was not a property owner contended that he was deprived of equal protection by a New York statute that permitted only property owners, parents of students or persons who stood in loco parentis to students to vote in school board elections. Judge Lumbard considered the claim "so patently without any merit" that he dissented. In doing so he observed:

" * * * [T]he franchise in local elections concerning, for example, wa-

---

17. E. g., Code of Ordinances, Jefferson Parish, Louisiana, § 18–11.

18. See, e. g., The State of the States: Troubled, *Newsweek* (January 31, 1966), pp. 19–20.

19. See, e. g., Texas Const., Art. VI, § 3a, Vernon's Ann.St.; City of Richmond v. Allred, 1934, 123 Tex. 365, 71 S.W.2d 233; Utah Const., Art. XIV, § 3.

ter supply, sanitation removal, fire protection, and the operation of parks and schools is very commonly limited to those who use and/or pay for the services. And such limitations have a readily apparent and rational basis, the greater concern and awareness of those who use and pay for such services, for which there is no analogue when voting in a statewide legislative election is conditioned upon payment of a poll tax." 379 F.2d at 497 (footnote omitted).

And he commented further,

"[T]he salient vice of a restriction upon voting in statewide elections is that it tends to perpetuate itself by denying those it disadvantages any opportunity to remove it through democratic processes. See The Supreme Court, 1965 Term, 80 Harv.L.Rev. 91, 180 n. 23 (1966). By contrast, plaintiff can seek to have his exclusion from the school district franchise repealed by the New York legislature, for which his vote is unimpaired." Id.

Even when considering whether a state statute prohibiting the sale of obscene publications to juveniles impairs the right to free speech, the test of validity is not whether judges agree with state legislatures or whether the legislative findings express "an accepted scientific fact." For "[t]o sustain state power to exclude material defined as obscenity * * * requires only that we be able to say that it was not irrational for the legislature to find that exposure to material condemned by the statute is harmful to minors." Ginsberg v. State of New York, 1968, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195. "We do not demand of legislatures a 'scientifically certain criteria of legislation.'" Id.

If the federal system is to continue, the states must be free, within the limits of rationality, to adopt their own solutions to their own problems, to ex-periment even if their experiments sometimes fail. The courts are not a collective omniscient father who always knows best. The Constitution ordains a rule of reason, not a strait jacket of egalitarianism. It must allow that latitude that is essential to the experimentation, development and change needed by a nation composed of fifty different states and thousands of state-created political subdivisions. The measures adopted by Louisiana to meet its own notions of how its people should determine the desirability of issuing public utility revenue bonds are neither so arbitrary or irrational as to bring down the stricture of the Fourteenth Amendment. Judgment will therefore be entered for the defendant.

WISDOM, Circuit Judge (dissenting).

I respectfully dissent.

I consider that Harper v. Virginia State Board of Elections, 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169, controls the case before this court.

In *Harper* the Supreme Court found that "voter qualifications have no relation to wealth nor to paying or not paying this [poll tax] or any other tax". 383 U.S. 666, 86 S.Ct. 1081. It is true that the tax itself was attacked in *Harper* and that a poll tax is a qualification limiting suffrage in an election to vote for political representatives. Here the qualification limiting voting to resident property taxpayers applies to a vote on the issuance of municipal revenue bonds. I recognize the differences in the two situations. But the basic similarity is more important than the differences. The common fact in both situations is that eligibility to vote rests on payment of a tax. But all citizens have a stake in government—federal, state, or local government—regardless of ownership of property as evidenced by payment of a tax. This interest entitles each citizen to a voice in all elections in his city or

state. As the Court said in *Harper*, "Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process. Lines drawn on the basis of wealth or property, like those of race * * * are traditionally disfavored". 383 U.S. at 668, 86 S.Ct. at 1082. Here, in a bond election, a citizen's lack of ownership of taxed real estate is not proof positive of his lack of interest in his city's going into the utility business.

As my brother Rubin ably analyzes the issues, the case is not one to be settled by broad generalities. The issues reduce to the question whether the distinction between property owners and non-property owners is rational or arbitrary in fixing the qualifications for voting on the desirability of a city's issuing revenue bonds to acquire and operate a public utility. The city has the legal authority to issue such bonds, even without asking the advice of any of its electors, but if a city should in advance of issuance of revenue bonds ask for the approval of its citizens the equal protection clause prohibits the city's arbitrarily excluding from the election interested citizens.

Houma has a population of 35,000. As of October 24, 1967, there were 11,-606 registered voters. Only 4,680 were taxpayers owning property and the total assessed value of their property was only $5,988,627. Thus forty per cent of the resident voters owning taxed property constituted a class controlling the interests of *all* the citizens of Houma in the policy decision submitted to the voters in the bond election. 1,828 voters representing an assessed valuation of $2,736,258 voted in favor of issuance of the bonds; 896 representing an assessed valuation of $1,108,268 voted against the bond issue.

As citizens of Houma, non-property residents have the same proprietary interest in municipal properties as resident taxpayers. They have the same interest in the administration of city affairs.

And they are no less interested in the amount of their light bills than are property-owners. Indeed, since they constitute sixty percent of Houma's electors, they have a greater aggregate of interests than the property owners have in municipally owned utilities.

In the case before us, the discrimination against citizens not owning taxed property is exacerbated by the fact that the bonds are revenue bonds. The bonds are to be paid only from the operations of the utility; they are not a charge upon other income and revenues of the municipality and are not included in computing the indebtedness of the municipality for the purposes of any constitutional or statutory debt limitation. If the operations should be unprofitable, the property-owner will have no greater burden than anyone else. If the operations should be profitable, the profits go into the General Fund of the City of Houma and, presumably, will aid all the citizens in providing police protection, fire protection, and other city services.

There is a wide difference of opinion between the plaintiffs and the defendants as to whether the effect of Houma's ownership of utilities will be an increase or decrease in light and gas bills. But certainly everyone in Houma who flicks on an electric light or whose wife turns on the gas in the kitchen has a genuine interest in the question—whether he is a landlord or tenant. The tenant should be able to protect that interest by a declaration in the form of a vote—if the proposition is put to his landlord. In one way or another, the tenant pays the bill.

There may have been a time when ownership of property as a voter's qualification could have been defended as part of the American system of checks and balances. The vote of the property-owners could be looked to as a restraint on governmental operations financed by taxes. The framers of the

United States Constitution did not adopt this limitation on federal sufferage, but a number of the states did limit the vote to freeholders. Now, however, we are living in an age when there are utility taxes, sales taxes, cigarette taxes, gasoline taxes, income taxes, and a host of taxes, notions of which never crossed the minds of the Founding Fathers. It is a mistake therefore to put all property taxpayers in a class with veto power over governmental revenue bond issues, as if other classes of citizens pay no taxes to their city or state and have no legitimate interest in governmental operations.

The defendant's argument that property owners have a special interest is enough in itself to destroy the rationality of the classification in a revenue bond election. In such an election, the vote is limited to persons whose property taxes will, by statute, not be increased if the revenues fall short of expectations. If the General Fund of the City should suffer, the greater share of the burden will fall on the excluded class of non-property owners, that is, sixty per cent of the resident voters. In final analysis, the requirement of property ownership invites the property owners, forty per cent of the voters, to vote themselves lower ad valorem rates or the continuance of existing rates while shifting the greater burden of carrying the City's General Fund to the other sixty per cent of the resident voters.

I would hold that the distinction between property owners and non-property owners in an election to vote on the issuance of municipal revenue bonds is so arbitrary as to deny equal protection of the laws to the excluded non-property owning residents of Houma. Accordingly, I would grant the injunction and the requested declaratory judgment. Such a holding need not affect adversely bonds now outstanding. To protect the vested interests of cities and bondholders in bonds already issued, I would apply the decision—as I see it—prospectively only.