Robert Cushman MURPHY, Mary T. Richards, Marjorie Spock, John C. Homer, Gladys Weeks, and David Kennedy, Plaintiffs,

v.

Ezra Taft BENSON, Secretary of Agriculture of the United States, Lloyd Butler, Area Supervisor of Plant and Pest Control Division, Daniel Carey, Commissioner of Agriculture and Markets of the State of New York, Defendants.

Civ. A. No. 17610.

United States District Court
E. D. New York.

May 24, 1957.

Roger Hinds, New York City, for plaintiffs, Roger Hinds and William B. Schrauff, New York City, of counsel.

Leonard P. Moore, U. S. Atty. for the Eastern Dist. of New York, Brooklyn, N. Y., for defendants, Ezra Taft Benson and Lloyd Butler, Lloyd H. Baker, Asst. U. S. Atty., Brightwaters, N. Y., and Harold M. Carter, Atty., U. S. Dept. of Agriculture, Washington, D. C., of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, for defendant, Daniel Carey, Irving L. Rollins, Asst. Atty. Gen., of counsel.

BYERS, District Judge.

This is a plaintiffs' motion for a temporary injunction in an action in which the complaint was filed May 8, 1957 for a permanent injunction against the spraying of trees on plaintiffs' lands. The object of the spraying is to eradicate gypsy moths.

The motion is based upon the affidavits of the plaintiffs Murphy, Richards, and Spock; also those of Dr. W. C. Martin, a practicing physician in New York and Dr. Morton S. Biskind, a practicing pharmacologist of Westport, Connecticut. These gentlemen have made special studies in the field of insecticides and their effects upon human beings, and animal and vegetable life. There is also an affidavit of one Darbee, Chairman of the Conservation Committee of a Rod and Gun Club of Roscoe, Sullivan County, New York.

The foregoing present the reasons why a temporary injunction is sought.

The affidavits in opposition are those of

Emory D. Burgess, Director Plant Pest Control Division, Agricultural Re-

search Service, Department of Agriculture;

Dr. M. R. Clarkson, Deputy Administrator for Regulatory Programs, Agricultural Research Service, Department of Agriculture;

W. L. Popham, Assistant Administrator, same;

Thomas F. McGinty, Head of Reporting Activities Section, Information Division, same;

Clarence H. Hoffmann, Assistant Director Entomology, Research Division, same;

Herbert L. Haller, Assistant to the Administrator, Production Research Service, same;

Miles Horst, Staff Assistant Program Appraisal, Office of the Secretary, same;

E. J. Dyce, Professor of Apiculture, New York State College of Agriculture;

Harry L. Smith, Regional Supervisor of Plant Pest Control Division, U. S. Department of Agriculture (Moorestown, N. J.);

James G. Lyons, Assistant Commissioner of Agriculture and Markets of the State of New York.

Also, an affidavit was filed by an Assistant United States Attorney for this District opposing the application for the convening of a three-judge court, later to be referred to; and that the failure to serve the defendant Benson, Secretary of Agriculture, personally, deprives the court of jurisdiction of the case as to him; also that he could not be served in the District of Columbia in this cause. Further that he is an indispensable party and that a decree herein would not be effective by reason of service upon the defendant Lloyd Butler, for reasons said to be pointed out in the above affidavit of Dr. Clarkson. Further that there is no substantial constitutional question involved since the only issue that is important has to do with administrative action, namely, the method by which the statutory power has been carried into effect.

The motion was heard on May 15th, and briefs and all affidavits were submitted on the 21st.

No answer has as yet been filed, and so the case is not at issue.

The allegations of the complaint may be summarized as follows:

The action is said to arise under the Fifth and Fourteenth Amendments of the Constitution, and under Title 7 U. S.C.A. entitled Agriculture. Sections 141 to 149 deal with Insect Pests.

Section 145 refers to the menace to cotton culture in the United States of the pink bollworm, and the Secretary of Agriculture is authorized to take appropriate action in connection therewith.

146 and 147 are directed to the European corn borer and its eradication or control. The immediately relevant sections are quoted in part:

"§ 147a. Control and eradication of pests and plant diseases; * * *

"(a) The Secretary of Agriculture either independently or in cooperation with States or political subdivisions thereof, * * * is authorized to carry out operations or measures to eradicate, suppress, control, or to prevent or retard the spread of Japanese beetle, * * * gypsy and brown-tail moth, * * *."

"§ 148. Control of insect pests and plant diseases

"The Secretary of Agriculture, in cooperation with authorities of the States concerned, * * * is authorized and directed to apply such methods for the control of incipient or emergency outbreaks of insect pests or plant diseases, including grasshoppers, * * * as may be necessary."

It may be observed that this comprehensive program seems to have first appeared in the laws of 1917, and subsequent amendments have been adopted through 1949.

Resuming a summary of the complaint, it is asserted that the plaintiffs are resi-

dents and citizens of Nassau and Suffolk Counties within this District, and owners of homes, woodlands and gardens, including organic gardens; that the defendants threaten to spray from airplanes said properties of the plaintiffs with DDT, which is an insecticide, and will do so unless restrained by this court; that the plaintiffs have protested against such spraying and that the defendants purport to be authorized by the said statute and by Section 164 of the Agriculture and Markets Law of the State of New York, McKinney's Consol.Laws, c. 69, being Laws of 1927, Chapter 212; that the federal statute as so to be enforced, violates the Fifth Amendment to the Constitution "as depriving plaintiffs of property and possibly lives without due process of law and taking their private property for public use without just compensation"; that the state statute is violative of the Fourteenth Amendment in that the said spraying "will tortiously and illegally trespass upon the persons and property of the plaintiffs, and cause them irreparable damage."

That DDT is a "delayed-action, cumulative poison such as will inevitably cause irreparable injury and death to all living things, including human beings, animals, birds, insects and the predators and parasites of harmful insects, if ingested, inhaled or brought in contact therewith in sufficient quantities or over a sufficient period"; that all human beings in the said area have absorbed and now retain in their bodies substantial and measurable amounts of DDT, which is toxic and pathological "so that the threatened spraying upon their persons will endanger their health and lives, and the threatened spraying upon their gardens and other cultivated lands will make it unsafe for them, this year or ever thereafter, to eat the produce therefrom." Methods are further alleged whereby the threatened result is believed to be inevitable.

It is also alleged that the threatened spraying will prevent plaintiffs from utilizing their lands for so-called organic cultivation with organic fertilizer and biological pest controls "to the complete exclusion of chemical poisons."

That no trees, shrubs, etc. on the lands of any of the plaintiffs are infested or infected with the gypsy moth or any other injurious insects or plant diseases; that the Commissioner of Agriculture, etc., of the State of New York has not (pursuant to Section 164, subd. 2 of the Agriculture and Markets Law) declared any trees, shrubs, etc., upon the lands of the plaintiffs to be public nuisances, etc.

That no public emergency exists to justify the spraying complained of; that a basis of the objection of the plaintiffs is that the moths "like other pests, soon, by evolution, develop a resistance to DDT and other chemical pesticides; the spraying acts upon their predators and parasites more powerfully than upon the pests themselves, upsetting Nature's balance and defeating its own object" and finally that the plaintiffs have no adequate remedy at law in the premises. .

Clearly the plaintiffs believe that they will be seriously harmed by the complained of spraying, and their grievance as pleaded is of such a nature that full and complete opportunity must be afforded to them to establish by legal evidence the existence of the conditions of which they complain. In the absence of denials which would be appropriate in defendants' pleadings which thus far have not been filed, the court must turn to the affidavits, pro and con, in an effort to ascertain whether the necessity for a temporary injunction has been demonstrated.

At the outset, however, it is necessary to deal with certain technical aspects of the litigation which are presented by the affidavits of the Assistant United States Attorney and of Mr. Lyons, the Assistant Commissioner of Agriculture, etc. of the State of New York:

(1) There has been no service of process upon the Secretary of Agriculture in person, and thus the court lacks jurisdiction.

It is true that the only service upon the Secretary has been by registered mail and the objection is therefore well taken. Rule 4(d)(4), F.R.C.P. 28 U.S. C.; Noreen v. Van Dyke, D.C., 133 F. Supp. 142.

Unless and until the Secretary consents that the case proceed against him on the merits and thus submits himself to the jurisdiction of the court, which he might well do for the sake of so meeting the issues to be made, this decision must proceed upon the basis that jurisdiction over the Secretary of Agriculture has not attached.

(2) That the defendant Butler, Area Supervisor of Plant and Pest Control Division of the Department of Agriculture, cannot stand in the shoes of the Secretary for the purpose of this litigation; the statement is that he has no authority to suspend spraying operations "for other than operational reasons." This is urged to sustain the proposition that the Secretary is an indispensable party and thus the present litigation must fail.

This is the kind of technical position to which the legal mind is instinctively drawn as though by a powerful magnet; however, a de-sensitizing process evolves itself from the common-sense aspect of the case.

It must be obvious that a mere telephone communication between Mr. Butler and the Administrator in Washington would clothe the former with any authority needed to bring about a suspension of the spraying operation if that were to be ordered.

A similar situation is discussed in the case of Williams v. Fanning, 332 U.S. 490, 68 S.Ct. 188, 92 L.Ed. 95, and if I correctly understand that decision, the distinction would be drawn between a decree or judgment which might call upon the Secretary of Agriculture to cease to function under the provisions of this statute on the one hand; and the mere suspension of a given operation contemplated thereby, on the other; in other words, if Butler were authorized to sus-

pend spraying for gypsy moths, his presence in the case as a defendant would be adequate, while if all operations for the control of insect pests were deemed to be in violation of the Constitution and a competent court should so decide, the abandonment of the entire campaign would require that the Secretary of Agriculture take appropriate action to that end.

■ It is thought therefore that the presence of Butler as a defendant and the service of process upon him within this district, is sufficient to clothe this court with the power to function.

As above suggested, the Secretary may yet find it the part of enlightened policy to waive any technical question of the jurisdiction of the court over him, and officially submit himself thereto for the purpose of removing from the case any argument touching his indispensability as a party.

■ (3) Concerning the issue of constitutionality and the occasion, if that issue is to be determined, of convening a statutory court (Title 28 U.S.C. § 2282), it is thought that such necessity has not been shown, and for the following reasons:

(a) Sections 147a and 148 of Title 7 constitute but a part of an over-all statutory scheme adopted by Congress for the control and elimination of insect pests throughout the United States, promulgated about forty years ago. If that concept involved an unconstitutional delegation of powers, the occasion for adequate inquiry and comprehensive consideration is not presented by this complaint. In other words, this is not deemed to be a sufficiently substantial challenge to the constitutionality of the statute to invoke the jurisdiction of a specially constituted court.

(b) The cause presented by the plaintiffs (as supplemented by their affidavits), merely charges at most an error in judgment on the part of the Secretary in carrying into effect the powers and authority which Congress has conferred upon him. Cf. Jameson v. Morgenthau,

307 U.S. 171, 59 S.Ct. 804, 83 L.Ed. 1189.

Whether that challenge is supported by evidence requires a trial of the issues and if the outcome be favorable to the plaintiffs, the question of constitutionality will remain untouched; while if the contrary result is reached, the alleged constitutional aspect of the controversy will not be present.

No sufficient issue concerning the constitutionality of the Agriculture and Markets Law of the State of New York is present to require separate discussion of that subject.

It is realized that this court cannot in any true sense decide the issues which are presented by the conflicting affidavits, as a scientific finality; it can but weigh the sworn assertions, pro and con, and then conclude what the preponderance seems to show.

Without quoting at length from the opposing affidavits, the respective showings may be recapitulated briefly in this wise:

(a) The individual plaintiffs conduct "organic" cultivation of both fruits and vegetables, which is particularly susceptible to the deleterious effects attributed to this kind of spraying. Doctors Martin and Biskind are convinced that DDT is a cumulative poison and adversely affects human beings and animal and vegetable life. Attached to the affidavit of the latter is an article written by him and also the official transcript of his testimony before a Congressional Committee.

The showing is convincing of the sincerity of the efforts that are being brought to bear to induce the court to enjoin these spraying operations.

(b) The affidavits in opposition have been listed above and have been carefully studied; it would unnecessarily extend this opinion to quote from them. They are equally impressive as to the nature and extent of the depredations of the gypsy moth and the devastating effect that it has upon oak, apple, birch, linden, beech, aspen and willow trees.

The destructive effort of defoliation upon the trees themselves and the direct damage caused to the supporting soil is convincingly demonstrated, as the result of painstaking observation.

The gypsy moth was introduced into this country in about 1869 and by 1906 it had become such a menace that organized and effective efforts to control and, if possible, exterminate this pest, have become imperative.

As the result of experimentation it was found that the application of arsenate of lead was feasible by the use of hydraulic sprays at a cost of about $25 an acre; that method required a spray crew of several men and was restricted in effect by the limitations of manual application.

The use of DDT came into practice following World War II, and a spray consisting of one pound of DDT and one gallon of solvent (light oil) has been applied by the use of aircraft, over a wide area in the Eastern States with highly satisfactory results.

Perhaps the best summary of the conditions that pointed to the necessity for Governmental intervention, will be found in the following resolution adopted in 1955 by the National Plant Board representing 48 States, concerning the control of pests that attack and destroy our crops and forests; four preambles which portray the widespread emergency, introduce the following resolution:

"Be It Resolved, the National Plant Board urges that the gypsy moth control project be considered henceforth by the U. S. Department of Agriculture and infested states, as within the eradication category, rather than within the containment classification; that definite plans be initiated immediately to begin an accelerated program in 1957 fiscal year, and that representations be made by all agencies involved at once to interest appropriating authorities in the procurement of funds required to translate this proposal into reality."

Such a formulation of informed opinion could not be ignored by the agencies of Government; and the research conducted by the trained staffs of both Federal and New York State departments was directed to an intelligent program designed to deal with the realities of a perplexing situation.

That the techniques devised have not been perfect in performance, clearly appears from some of the affidavits filed in opposition to the motion. The candid admission that animal life has in some measure been adversely affected, does not militate against the showing of affirmative benefits on a large scale, which have been brought about.

As to the effects upon human beings, the Haller affidavit states:

"In all of the 17 years with which I have worked and been associated with the development of DDT, I know of no case of illness caused by DDT. The United States Department of Agriculture has received numerous letters from individuals in various parts of the country requesting the Department to discontinue the use of DDT because of the increased deaths due to cancer, heart disease, and others. In none of the letters has a specific case been cited where an individual or group was made ill or died as a result of DDT. I know of no instance where individuals have been made ill from the ingestion of food containing residues of DDT."

It would simplify matters if it were possible by court action to separate the residents of Nassau and Suffolk Counties into:

(a) Those who prefer the deluge of caterpillars which later become gypsy moths and the ravages of the latter in their adult stage, to paying the price of control or extermination through DDT spray, and

(b) Those who do not.

If that division could be made and the spraying operation contrived to function accordingly, the result would be acceptable, at least in theory. Since so desirable an outcome is not attainable, the court is compelled to dispose of this motion according to the balance established by weighing the opposing data presented in the respective affidavits.

The result of this analysis tilts the scales in favor of the defendants on the present showing. This is not to say that at a trial when the expert witnesses on both sides have undergone cross-examination, and an ever expanding increase in scientific attainments has been exposed, the result necessarily would be the same. It is to say, however, that on the present showing, the plaintiffs have not presented persuasive evidence that the threat of irreparable damage to them is in excess of that which would probably be visited upon the community in general, if a temporary injunction were to be granted as sought.

Since the case is not at issue as has been stated, it cannot be at once noticed for trial, but as soon as the issues have been joined, it would be appropriate for plaintiffs to seek a preference so that their cause may reach decision at the earliest favorable time.

Motion for temporary injunction denied. Settle order.