Robert Cushman MURPHY et al.,
and
Archibald B. Roosevelt et al., Plaintiffs,
v.
Ezra Taft BENSON, etc., et al.,
Defendants.

Civ. No. 17610.

United States District Court
E. D. New York.

June 23, 1958.

Roger Hinds, New York City, for original plaintiffs.

Frank C. Mebane, Jr., New York City, for added plaintiffs, William B. Schrauff, New York City, Vincent A. Kleinfeld, Washington, D. C., William J. Cahill, New York City, of counsel.

Cornelius W. Wickersham, Jr., U. S. Atty., E. D. New York, Brooklyn, N. Y., for defendant Butler, Lloyd H. Baker, Asst. U. S. Atty., Brooklyn, N. Y., Harold M. Carter, Atty., U. S. Dept. of Agriculture, Washington, D. C., of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, for defendant Daniel Carey, Commissioner of Agriculture and Markets of the State of New York, Irving L. Rollins, Asst. Atty. Gen., of counsel.

BRUCHHAUSEN, District Judge.

This action was instituted by various property owners to restrain public authorities from spraying their lands with an insecticide, known as DDT. The spraying was part of a long term program to control or eradicate the gypsy moth, an insect known to defoliate trees.

Prior to the spraying of the subject area, in the late spring of 1957, the plaintiffs commenced their action, wherein they sought both a preliminary or temporary injunction and a permanent injunction. In accordance with the practice, the application for the preliminary injunction was based upon affidavits. After a hearing and consideration thereof, the application was denied by Judge Byers. The opinion is reported in D.C., 151 F.Supp. 786.

Shortly thereafter the spraying, as planned, was commenced. It was completed early in June 1957. Thereafter issue was joined in the action and it proceeded to trial before this Court, without a jury.

While the spraying encompassed other portions of the northeastern section of the country, the issues herein are concerned principally with the plaintiffs and their property.

The plaintiffs, residents and property owners, located in the two Long Island counties of Nassau and Suffolk brought this action to enjoin or restrain the defendant Butler, the Federal official designated by his superiors to supervise the spraying operation in that area, and the defendant Carey, the State Commissioner of Agriculture, from committing trespasses upon their lands by means of low flying planes, discharging DDT thereon. The defendant Benson, the Federal Secretary of Agriculture, although named in the complaint, was not served with the papers and has not appeared as a party in the action.

The trial consumed almost a month. Some fifty witnesses testified, including a number of experts on the various phases of the case. Numerous exhibits were introduced into evidence.

While there are factual disputes, differences of opinion among those testifying as experts and complex legal questions, there is no substantial controversy as to the history of the gypsy moth, the measures taken through the years to control or eradicate the insect and the reasons therefor.

The Facts about the Gypsy Moth, the Measures Taken for Control and Eradication and the Reasons Therefor

In 1869, the gypsy moth, a leaf eating insect and one of the prime pests of forest, shade, fruit and ornamental trees in Europe, was imported into Medford, a suburb of Boston, by a French scientist, interested in experimentation. Larvae of the moth escaped from his home. The insect became established in nearby areas. The spread of the insect was slow at first, but some twenty years later the moths were so abundant in the Medford area as to cause the defoliation of extensive acreages. The townspeople contributed a substantial sum of money for control measures.

Millions of dollars have been expended since then by the Federal and State Governments in efforts to control or eliminate the pest. However, surveys disclose that despite such activities, the threat of damage by the gypsy moth has continued. The major infestations were located in the New England States and in portions of New York and New Jersey. Between 1953 and 1956, inclusive, male moths were recovered in numerous places on Long Island. In the fall and winter of 1956–1957 egg masses were found in various parts of Long Island, in the area between Brookville on the west and Amagansett and Greenport on the east. While there is no evidence of substantial defoliation in that area, more than six and a half million acres have been wholly or substantially defoliated in the northeastern States and more than 29 million acres, including three million acres in New York State were infected in varying degrees. The danger of forest fires in these sections has increased. During the course of years, experts from the various State Governments and informed individuals and organizations have conducted studies, experimented and suggested plans to deal with the situation, in conjunction with representatives of the Federal Department of Agriculture.

The potential range of the gypsy moth extends westerly to the Mississippi River. In this area approximately one hundred million acres are susceptible to damage by the insect. It appears that wind currents, transportation of lumber, conveyances and the like may be carriers of the larvae of the moth.

At a meeting in May 1952, the representatives of the council of State Governments called upon the Federal Agricultural Department to prepare a plan for the control or eradication of the

moth in the various States. In order to prevent the spread of the moth south and west of the infected areas, it was concluded that a so-called barrier zone, twenty-five miles in width, extending from the Adirondack Mountains to Long Island Sound should be established. In 1956, the National Plant Board, an organization comprised of Regulatory Officials from the 48 States, and others, recommended a spraying program in the barrier zone, comprising three million acres, for the purpose of eliminating the threat of spread of the moth to the southern and central States. The spraying of Long Island was included in the program.

During the past seventy years, the Government has expended large sums for the importation of predators and parasites, natural enemies of the gypsy moth and other destructive insects. This undertaking is a process of biological control, without the use of insecticides. It has not resulted in the elimination or eradication of the gypsy moth but has been helpful. The plaintiff Murphy, an experienced biologist, while claiming that biological control is feasible, conceded that the moth cannot be eliminated by such means. In more recent years that method has been supplemented by the use of insecticides, such as arsenate of lead and the chemical, known as DDT, consisting of fourteen parts carbon, nine parts hydrogen and five parts chlorine. The latter has come into extensive use during the past fifteen years. Although discovered much earlier, it wasn't until World War II, that wide usage of it came into play, first as an Army insecticide and thereafter in the forest and agricultural fields.

### The Effects of DDT upon the Health of Human Beings

Although the plaintiffs contend that the chemical is deleterious to health and likely to cause future ailments they presented no evidence that they or anyone else were made ill by the spraying of DDT in the Long Island area.

A real difficulty presents itself in coming to a definite conclusion as to the overall effects of the chemical. DDT has not been in use for a sufficient length of time to definitely evaluate its potentials. Furthermore, there are very few experts possessing the requisite broad and intensive experience with this pesticide. It appears that the defendants' expert, Dr. Hayes, is the only living physician in this country, who has engaged in experimental work as to the effect that DDT has on human beings. Coupled with these elements is the fact that some are so strongly in favor of organic farming, without the use of chemicals, or emphasize their preference for biological control that their judgments may be influenced by their leanings. Under these circumstances, it is appropriate that the experts' testimony be scrutinized.

### Analysis of the Testimony of the Plaintiff's Experts, Dr. William C. Martin, Dr. Malcolm M. D. Hargraves, Dr. Granville Knight and Dr. Francis M. Pottenger, Jr.

Dr. Martin testified, in substance, that he is a specialist in geriatrics; that in 1954 he made 25 autopsies and found that the subjects had ingested an average of 3.5 parts per million of DDT; that DDT affects the nerves and damages cells in the liver, that it accumulates in the system unless eliminated, that some people are more susceptible to it than others, that he found 15 patients with DDT poisoning; that as a general rule most people subjected to a spraying of one pound per acre (the amount used on Long Island) would not be adversely affected, that it has a harmful effect on elderly people, that the average person has 6 parts per million of DDT in his system, that it is impossible to ascertain what tolerance or capacity human beings have for absorption of DDT, that he is in accord with the conclusion of the United States Public Health Service that DDT in a human being reaches a level of saturation or equilibrium, beyond which point the body eliminates the excess, that his views are in the minority, that the Public Health Service has done more work in this field than have others,

that DDT is no more harmful in milk than in vegetables and that DDT accumulates in the enzyme system of the body and might not show its effects for thirty or forty years. Dr. Martin's experience with DDT, collateral to his study of geriatrics, does not seem sufficiently broad and intensive to warrant acceptance of his conclusions. There is no evidence that he has distinguished between massive doses of DDT or exposure indoors as compared with the spraying of it in adulterated form of one pound per gallon per acre, the solution used in the spray program on Long Island.

Dr. Hargraves testified that most of his career has been spent as a medical consultant with the Mayo Clinic, rather than as a physician in private practice, that the average person stores 6 parts per million of DDT in his system, that persons hypersensitive to DDT are in the minority and that the spraying of one pound per acre is deleterious to health. Dr. Hargraves is heavily interested in the subject of conservation. While the witness is a physician of long experience, he has not indicated sufficient knowledge of the effects of DDT for acceptance of his opinion. On cross-examination, he stated that he had no knowledge as to how much DDT would enter the body on exposure to a spray of one pound per acre per gallon, that his opinion was based on subjective symptoms of his patients, i. e., what they told him about their ailments, that the symptoms of persons affected by DDT are also symptoms of other diseases and that physicians generally have not become alarmed over the dangers of DDT and similar hydocarbons.

Dr. Knight is a California nose, throat and nutrition expert. He testified that DDT adversely affects people suffering from liver ailments, and that even small amounts may affect hypersensitive individuals. While the witness has read considerable literature and attempted to keep himself informed on the subject, his testimony consists largely of generalities and is not helpful. In fact, he states that

the subject is rather new and that absolute proof is lacking. He conducts an organic farm.

Dr. Pottenger is a California physician, specializing in nutrition. He asserts that DDT accumulates principally in the liver, nerve tissues and kidney and can cause injury and death and that the average patient in 1957 had absorbed more hydrocarbon than was the case in 1950. While the witness has made a number of biopsies or examinations of fat tissues of patients, tissue wherein DDT concentrates, there is no evidence that he performed autopsies or examinations to ascertain causes of death nor that he made studies of persons subjected to a spray of one pound of DDT per gallon per acre. Furthermore, the witness fails to indicate the nature of the exposure of his patients to DDT and its concentration.

Analysis of the Testimony of the Defendants' Experts, Doctors Wayland Hayes, Frank Princi and Frank P. Cleveland

Doctor Hayes is Chief of Toxology of the United States Public Health Service, which department he organized in 1949 and is a member of the expert panel on Insecticides of the World Health Organization of the United Nations. It is his function to study health problems of pesticides. He and his associates have experimented with DDT on human beings and animals, feeding them DDT with daily doses for periods of a year or more and checking the results.

I was strongly impressed with this witness, especially because his opinions are supported by actual tests with measured amounts of DDT and by scientific evaluation of the results. His conclusions are that storage of DDT in the human body eventually reaches an equilibrium, that there is no evidence of increase in storage levels over the last few years, that the maximum capacity or toxicity of DDT for human beings, young or old, is unknown, that feeding DDT to a group of men at the rate of 35 miligrams per day for over a year

produced no ill effects, that 35 miligrams per day is approximately 200 times more than the amount of DDT consumed daily without ill effects by persons eating restaurant meals, that the storage or equilibrium reached by them was 340 parts per million, that there is no evidence that some people are sensitive to DDT or that it causes liver damage, that a spray of one pound per acre is equivalent to 10.4 miligrams per square foot, that individuals may avoid ingesting DDT by eating organic vegetables, i. e., those uncontaminated by DDT and abstaining from eating meat, but if they also eat meat they ingest DDT at an average of 0.184 miligrams per day in that the DDT is stored in the fats and oils of animals, ingested by them from forage subjected to DDT spraying, that DDT is no more harmful in milk than in other food and, finally, that while DDT may cause illness if ingested in massive doses, there is no danger to health in a spray of one pound per acre.

The defendants' witnesses, Doctors Princi and Cleveland are affiliated with the Kettering Laboratory in Cincinnati, which has a staff of one hundred and sixty individuals. Some of the chemical concerns have sponsored researches and reports, upon condition, however, that the organization may publish its findings without consulting the sponsor. Both experts impressed the Court as credible witnesses. Doctor Princi has devoted his talents to industrial medicine. He has conducted experiments with individuals and animals and studied the cases of some one thousand patients, claiming contact with various chemicals, including hydrocarbons. He concluded that eighty percent of the patients exhibited symptoms of diseases other than those caused by such chemicals and that actual illness occurred only where there was massive exposure to the chemical.

Doctor Cleveland has concentrated his efforts in the field of pathology. He has made numerous tests of hydrocarbons on animals and found that they can tolerate thirty parts per million of DDT for life, without deleterious effects. Supple-menting his laboratory work, he carries on as County Coroner, performing some three hundred autopsies annually. Approximately one-third thereof are poisonings, none by DDT. He concludes that a spray of one pound per acre is not deleterious to health, that the feeding of hydrocarbons to rats in sufficient quantity to cause intoxication produced liver change but not damage and that he was unable to determine the significance of the change.

■ The Court concludes that the plaintiffs have failed to establish that the subject spraying was injurious to health.

### As to Damage to Birds, Fish, Bees and Growing Crops by Spray of DDT

The plaintiffs have not sustained their claim that spraying causes any considerable loss of birds, fish, bees and insects. Only a few fish and birds were killed in the subject area. Furthermore, evidence of spraying programs throughout the country demonstrates that the fish, bird and bee loss has been inconsequential.

While there is no evidence of damage to bees and aquatic insects in the subject area, experts and others from various sections of the country established that the defections are made up by repopulation in a short space of time. A loss of bees however during the season for production of honey may cause a temporary reduction in the output. After a spray there is a marked increase in red spiders and aphids, neither of which cause tree damage. On the other hand, DDT is an enemy of mosquitoes.

There is no proof that DDT injures plants as living organisms nor that plants absorb it from the soil and transfer it to edible portions. A number of the plaintiffs' witnesses testified that the spray did render vegetables, such as peas and lettuce unfit to eat.

### As to the Effect of Airplane Spraying in Eradication of the Gypsy Moth

There is overwhelming evidence that airplane spraying of DDT has eradicated

the gypsy moth in the areas where it has been resorted to, also that it is not possible to accomplish the objective without spraying the entire area in that the most intensive explorations fail to reveal all of the places they infest, especially in that they are often behind rocks and inaccessible places and are known to come from other areas.

### As to Whether Proper Methods Were Used in Spraying the Long Island Area and Whether the Defendants Pursued the Usual Practices

It is evident that the spraying of the Long Island area presented a somewhat different situation than existed in many sections of the country not as heavily populated and cultivated. One may readily comprehend the reaction of the resident, drenched with the spray, a mixture of DDT and kerosene oil, while walking to the railroad station as well as the attitudes of those meeting with similar experiences at or near their homes. It would seem that the plaintiffs' major complaint is of annoyance, rather than damage. Fortunately few individuals were so affected, for the reason that the operations were conducted in the early hours of the morning.

Admittedly, the spray operation did not contemplate avoidance of small areas such as railroad stations, kitchen gardens, swimming pools and vehicles. However, the pilots were instructed to omit cow pastures, ponds, streams and orchards in bloom.

Some of the witnesses claimed that areas were sprayed more than once. Under varying circumstances wind, heated surfaces and pilot failure may cause uneven distribution.

The claim that the use of helicopters is feasible for large areas is not sustained.

It has been established that with the use of light aircraft and adequate marking of sites, areas of one or more acres can be omitted but it is not possible to avoid small ponds. However, even though the places to be avoided are well marked, it is difficult to pinpoint and eliminate them in densely populated sections. Much depends on close timing and the right type of plane. The defendant Carey expressed dissatisfaction with the methods of controlling flight patterns and programs of the two and four engined aircraft used in the spraying operation and stated that efforts would be made to so improve the system as to avoid spraying an area more than once.

It is evident that more intensive planning, preparation and caution should be exercised in connection with spraying a highly developed and built-up section such as Long Island than is the case of woodlands in the more isolated areas. It does not appear that there has been any variance in method of procedure in any case.

### As to the Threat of Again Spraying DDT on Long Island

The record discloses that no decision has been reached as to a future spraying program, that research will be carried on during the ensuing year in connection with chemicals other than DDT, changes in flight patterns, types of planes and other matters, before reaching a decision. It seems unlikely that there will be further aerial spraying on Long Island for the reason that last year's spraying was very effective.

### The Secretary of Agriculture Is Not an Indispensable Party

The defendant Butler admittedly was employed by the Federal Department of Agriculture. While he did not contract for the spraying, he briefed the pilots of the planes, gave them their instructions and was responsible for the carrying out of the operations of the spray program. If he refrained from giving the orders, there would be no spraying. The plaintiffs' prayer for relief is that he may be directed to desist and restrained from further spraying. Inasmuch as the granting of such relief would not require the Secretary of Agriculture "to take new action," the latter is not an indispensable party. Williams

v. Fanning, 332 U.S. 490, 494, 68 S.Ct. 188, 190, 92 L.Ed. 95.

### As to the Plaintiffs' Contentions that the Mass Sprayings Were Not Authorized by Law

The plaintiffs assert that the statutes under which the defendants acted did not empower them to conduct mass spraying operations and, further, that if the defendants' actions were authorized by those statutes, then the statutes conflict with the due process provision of the Constitution. Inasmuch as Judge Byers has already held that the complaint presents no substantial constitutional question, we proceed to construe the statutes.

The Federal statute, 7 U.S.C.A. § 147 a(a), provides, in substance, that the Secretary of Agriculture either independently or in cooperation with States may carry out operations to eradicate, suppress, control, prevent or retard the spread of the gypsy moth and that a cooperating State shall be responsible for the authority necessary to carry out the operations or measures on all lands and properties within the State.

One of the plaintiffs' claims is that the State's power to deal with the gypsy moth was vested in the Commissioner of Conservation rather than in Mr. Carey, the Commissioner of Agriculture and Markets. While Section 58 of the State Conservation Law, McKinney's Consol.Laws, c. 65 empowers that department to take measures for the control of the gypsy moth, the statute does not render such power exclusive. Furthermore, the powers of the Commissioner of Agriculture and Markets are not confined to the food producing aspects of agriculture, as claimed. Article 14 of the Agriculture and Markets Law, McKinney's Consol.Laws, c. 69 is entitled "Prevention And Control Of Disease In Trees And Plants; Insect Pests; Sale Of Fruit-Bearing Trees." Of the eight sections of said article only one, Section 168, mentions fruit trees. Since Section 168 is specifically restricted to fruit trees, and no such limitation is contained in the other sections, the evi-

dent intent is that they should apply to trees and insect pests in general. Furthermore, various provisions of the Agriculture and Markets Law deal with such diverse non food producing subjects as the improvement of rural life, establishment of a State Fair, the licensing of stallions, the breeding of horses, the licensing of dogs, the protection of domestic animals therefrom, the weighing and selling of coal, coke and charcoal and the sale of liquified petroleum gas, all of which demonstrates that the claim lacks merit.

The relevant portions of the said New York Agriculture and Markets Law, prescribing the functions of the department and its Commissioner, the defendant Carey, are as follows:

"§ 164. Control and eradication of injurious insects and plant diseases.

"1. The commissioner shall take such action as he may deem necessary to control or eradicate any injurious insects or plant diseases existing within the state.

"2. All trees, shrubs, plants and vines or other material infected or infested with injurious insects or plant diseases, or which have been exposed to injurious insects or plant diseases, or which are hosts of such plant diseases, are hereby declared public nuisances and may be destroyed or ordered destroyed by the commissioner.

"3. The commissioner may order the owner or person in charge of any infected or infested trees, shrubs, plants and vines or other material or host plants * * * to take such measures to eradicate or control the said infestation or infection as the commissioner may deem necessary or proper. * * * Such owner or person in charge shall promptly carry out the order of the commissioner within the period of time designated in the order. If such owner or person in charge shall refuse or neglect to carry out any

such order, the commissioner may apply such eradication or control measures at the expense of the owner. * * *."

"§ 3. Declaration of policy and purposes. * * *

"Accordingly, all laws enacted concerning the agricultural industry and its allied subjects, whether included in this chapter or not, are to be deemed an exercise of the police power of the state and a discharge of its obligations for the promotion of the general welfare * * *.

"Such laws and all governmental measures adopted pursuant thereto should receive a liberal interpretation and application in furtherance of the aforesaid policy and purposes."

The principal issue of law is whether the spraying operation was a valid exercise of the State's police power.

 Police power by its very nature is not specifically definable, other than it must be in the public interest or convenience. Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385; Sligh v. Kirkwood, 237 U.S. 52, 35 S.Ct. 501, 59 L.Ed. 835; Reinman v. City of Little Rock, 237 U.S. 171, 35 S.Ct. 511, 59 L.Ed. 900. Furthermore, its exercise must be reasonable in relation to the evil which it is designed to combat and be neither arbitrary nor discriminatory. Purity Extract & Tonic Co. v. Lynch, 226 U.S. 192, 33 S.Ct. 44, 57 L.Ed. 184; Thomas Cusack Co. v. City of Chicago, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472; Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940. A Court may not interfere with or substitute its judgment for that of the Legislature. The wisdom of the legislation lies with the Legislature, not with the Court. Purity Extract & Tonic Co. v. Lynch, supra, 226 U.S. at page 202, 33 S.Ct. at page 46; Erie R. Co. v. Williams, 233 U.S. 685, 34 S.Ct. 761, 58 L.Ed. 1155. The latter case states that it is also presumed that the action taken by the Legislature is valid.

 Private rights may be abridged by the exercise of police power and must give way to the public interest. The rights of individuals are not limitless. Individuals must yield to the requirements of the public as a whole. Nebbia v. People of State of New York, supra; Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 772. It has been so held in cases involving freedom of speech, zoning laws and innoculation against disease. Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; Kovacs v. Cooper, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513; Sinclair Refining Co. v. City of Chicago, 7 Cir., 178 F.2d 214; Jacobson v. Com. of Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643. In a zoning case it was held that an individual's loss by the exercise of the power need not be compensated for in that the possible deprivation of a right through the exercise of the power is inherent in ownership of property. Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 375, 47 S.Ct. 114, 71 L.Ed. 303. An instance of the balancing of public rights against those of the individual occurred in the State of Virginia. A statute empowered a State official to cut down red cedar trees, infected by a cedar rust, endangering neighboring apple orchards. In upholding the statute, the Court in the case of Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 247, 72 L.Ed. 568, said:

"When forced to such a choice (between the preservation of one class of property and another) the state does not exceed its constitutional powers by deciding upon the destruction of one class of property in order to save another which, in the judgment of the legislature, is of greater value to the public. * * * And where the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property."

The cases, previously cited, hold that police power may not be resorted to by a Legislature unless its use is in the public interest or for the general good of the people. Experience has demonstrated in numerous instances of the exercise of the power that the rights of some individuals have been limited or their property destroyed. The fact that they, like the plaintiffs, have had unfortunate and disagreeable experiences in the process does not outweigh the element of public interest. Our highest Court held in Miller v. Schoene, supra, that the State has the choice and the power of deciding upon the destruction of one class of property in order to save another, which in the judgment of the Legislature is of greater value to the public. The evidence in the case at bar is that during the course of many years the gypsy moth has caused tremendous damage to trees in the northeastern States, including New York, and that further defoliation of trees is a continuing threat, despite the measures taken to solve the problem. Under these circumstances, the National Congress and the New York State Legislature enacted the legislation previously detailed, authorizing the taking of such actions as the respective officials deemed necessary to control or eradicate injurious insects, including the gypsy moth. The legislation clearly is in the public interest. Pursuant thereto, mass spraying of insecticide over large areas was the means adopted for carrying out the statutory objectives.

█ A further limitation on the exercise of police power is that the action taken must have a reasonable or substantial relation to the object sought to be accomplished, in this case, the control or elimination of the gypsy moth. Mass spraying with an insecticide obviously bears such relation. The plaintiffs have not successfully refuted this point. They contend that such spraying is neither an appropriate nor reasonable method of accomplishing the objective, and, further, that either ground or helicopter spraying is more effective. These claims are not supported by proof. Even if they were, they would not constitute a refutation of the reasonableness of the methods chosen and pursued. To find the proposed methods superior to those actually employed, the Court would be obliged to substitute its judgment for that of the Legislature. The Court may not usurp that province of a legislative body.

The assertion by the plaintiffs that the danger of the gypsy moth is remote has not been sustained, especially with the knowledge that the escape of a few moths from an experimental laboratory in Massachusetts originally created the problem, not only in that State but far beyond its borders. Another factor which undoubtedly entered into the consideration of the Legislators in the enactment of the statutes and in making the appropriations supporting them was the economic factor. Ground spraying costs twenty-five times more than aerial spraying.

█ Accordingly, I hold that the mass spraying has a reasonable relation to the public objective of combating the evil of the gypsy moth and thus is within the proper exercise of the police power by the designated officials.

### As to Plaintiffs' Plea for Injunctive Relief

█ In view of this Court's holding that the defendants' acts were authorized, it seems unnecessary to elaborate upon the plaintiffs' claim for injunctive relief, other than to state that the Courts will not restrain officials solely upon the basis that they acted beyond their authority or pursuant to a statute lacking constitutionality, without a clear showing for equitable relief, such as extraordinary circumstances where the danger of irreparable loss is both great and immediate. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714; Petroleum Exploration, Inc., v. Public Service Commission, 304 U.S. 209, 58 S.Ct. 834, 82 L.Ed. 1294; Boise Artesian Hot & Cold Water Co. Ltd. v. Boise City, 213 U.S. 276, 29 S.Ct. 426, 53 L.Ed. 796; Hawks v. Hamill, 288 U.S. 52, 53 S.Ct.

240, 77 L.Ed. 610; Fenner v. Boykin, 271 U.S. 240, 46 S.Ct. 492, 70 L.Ed. 927; Cavanaugh v. Looney, 248 U.S. 453, 39 S.Ct. 142, 63 L.Ed. 354; 28 American Jurisprudence 29. The plaintiffs have not made such showing.

The defendants are entitled to judgment, without costs. Submit findings and judgment on thirty days' notice.