362 U.S. 929
 80 S.Ct. 750
 4 L.Ed.2d 747
 Robert Cushman MURPHY et al., petitioners,
v.
Lloyd BUTLER, Area Supervisor, etc., et al.
 No. 662.
 Supreme Court of the United States
 March 28, 1960
 
 Messrs. Roger Hinds and Frank C. Mebane, Jr., for petitioners.
 Solicitor General Rankin, Assistant Attorney General Doub and Mr. Alan S. Rosenthal for respondent Butler.
 Messrs. Louis J. Lefkowitz, Atty. Gen. of New York, and Paxton Blair, Sol. Gen. for respondent Commissioner of Agriculture and Markets of State of New York.
 The motion to substitute a party respondent is withdrawn pursuant to stipulation of counsel. Petition for writ of certiorari to the United States Court of Appeals for the Second Circuit denied.
 Mr. Justice DOUGLAS dissenting:
 
 
 1
 In my view the issues involved in this case are of such great public importance that I record my dissent to the denial of certiorari.
 
 
 2
 The petitioners in this case are residents of a heavily populated suburban area in Long Island, New York, who brought an action in 1957 to enjoin respondents, federal and state officials, from carrying out a threatened program of aerial spraying of their lands, homes, gardens, and orchards with a mixture of DDT and kerosene designed to eradicate the gypsy moth, an insect injurious to forests. The program is part of a campaign embarked in 1956 by the Department of Agriculture to spray more than 3,000,000 acres of land in 10 States.
 
 
 3
 Petitioners alleged in their complaint that the threatened spraying was unauthorized by statute and so injurious to health and property as to violate the Fifth and Fourteenth Amendments.
 
 
 4
 The District Court denied a motion for preliminary injunction on May 24, 1957. 151 F.Supp. 786. Pending trial petitioners' homes, persons and lands received the spray. Respondents then contended that, because they had completed the spraying, the request for an injunction had become moot.
 
 
 5
 At the trial numerous experts testified to the public need for the spraying and the feasible methods available for the eradication of the gypsy moth. petitioners attempted to adduce evidence that the use of multi-engine airplanes was unnecessary, that their property had not been infested with the moths, and that the use of ground spraying equipment and helicopters was a feasible means of avoiding uninfested areas with the spray.
 
 
 6
 Expert witnesses testified that the spraying of pastures with the mixture, which consisted of one pound of DDT in one gallon of kerosene base solvent, applied at the rate of one gallon per acre, inevitably produce measurable quantities of DDT in milk from cattle which feed on the pastures, and that crops[1] which have been sprayed by DDT should not be fed to cattle. Nevertheless, dairy farms, pastures, homes, gardens, orchards, swimming pools, and fish ponds received the spray; and in some cases, it seems, they received substantially more than the planned one gallon per acre.
 
 
 7
 There was evidence that one of the petitioners who sells milk from her dairy had measurable contamination in the milk as late as five months after the spraying, which made its sale illegal under both federal and state regulations.
 
 
 8
 There was evidence that the vegetables grown by one of the petitioners for family use were rendered inedible and the leaves on some of his vines turned brown, rotted and fell off as a result of the spraying. Another petitioner, who spent $13,000 developing her land for chemical-free food production, testified that after the planes came over her plants were damaged and the fruit was withered, making it inedible. Several other petitioners complained that their fruits, vegetables, and berries were made unfit to eat.
 
 
 9
 Fish owned by two of the petitioners were said to have been killed by the spray; and dead birds were also reported. Predatory insects were also said to have been destroyed and as a result the quantity of red spiders and other pests increased. There was evidence that clothing was spotted and even ruined and that children coughed from the spraying and their eyes watered.
 
 
 10
 The extent of the danger of DDT to human health was a matter of sharp dispute among the numerous expert witnesses in the case. The testimony on many facts of this issue was extensive and elaborate. Yet the District Court made only one finding on the subject. It found: 'The spraying program, which is the subject of this action, at the rate of one pound of DDT per gallon of solvent per acre, is not injurious to human health.' No more specific findings were made on the matter and the court refused to make any findings on the spray's effect on milk, fruits, vegetables or other crops or products. Its only other finding on the issue of injury was that the spray 'does not cause any considerable loss of birds, fish, bees or beneficial insects.'
 
 
 11
 The complaint was dismissed on the ground, inter alia, that there was no proof of damages or that further spraying with airplanes was a likelihood. D. C., 164 F.Supp. 120.
 
 
 12
 The Court of Appeals, without reaching the merits, vacated the decision of the District Court with directions to dismiss on the ground of mootness. 270 F.2d 419. It held that respondents' evidence that another wholesale spraying operation was unlikely precluded the petitioners from obtaining an injunction.[2] The respondents did not, however, give positive assurance that they would not spray the area again if it became necessary. In fact, it was indicated that if studies reveal that the eradication was not complete, respondents will resort to further poisoning, though perhaps only local in nature and possible with different equipment. The program clearly was not abandoned.
 
 
 13
 In other cases we have held that the cessation of the activity complained of did not render the case moot, e. g., United States v. W. T. Grant & Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303, and if future activity of the nature complained of is feared, the courts and not impotent to fashion a remedy which minimizes any injury from a recurrence of the practice.
 
 
 14
 The public interest in this controversy is not confined to a community in New York. Respondents' spraying program is aimed at millions of acres of land throughout the Eastern United States. Moreover, the use of DDT in residential areas and on dairy farms is thought by many to present a serious threat to human health as evidenced by the record in this case as well as alarms sounded by others on the problem. The need for adequate findings on the effect of DDT is of vital concern not only to wildlife conservationists and owners of domestic animals but to all who drink milk or eat food from sprayed gardens.
 
 
 15
 We are told by the scientists that DDT is an insoluble that cows get from barns and fields that have been sprayed with it. The DDT enters the milk and becomes stored by people in the fatty tissues of the body.[3] Because it is a potential menace to health the Food and Drug Administration maintains that any DDT in milk in interstate commerce is illegal.[4]
 
 
 16
 The effect of DDT on birds and on their reproductive powers and on other wildlife,[5] the effect of DDT as a factor in certain types of disease in man such as poliomyelitis, hepatitis, leukemia and other blood disorders,[6] the mounting sterility among our bald eagles[7] have led to increasing concern in many quarters[8] about the wisdom of the use of this and other insecticides. The alarms that many experts and responsible officials have raised about the perils of DDT underline the public importance of this case I express no views on the merits of this particular controversy. Nor do I now take a position on the issue of mootness. But I do believe that the questions tendered are extremely significant and justify review by this Court.
 
 
 
 [1]
 See Grass, Yearbook of Agriculture, 1948, USDA, p. 278.
 
 
 [2]
 The Court of Appeals remarked that in the event of a possible recurrence of spraying in the area, 'it would seem well to point out the advisability for a district court, faced with a claim concerning aerial spraying or any other program which may cause inconvenience and damage as widespread as this 1957 spraying appears to have caused, to inquire closely into the methods and safeguards of any proposed procedures so that incidents of the seemingly unnecessary and unfortunate nature here disclosed, may be reduced to a minimum, assuming, of course, that the government will have shown such a program to be required in the public interest.' 270 F.2d at page 421, n. 1.
 
 
 [3]
 See Marth and Ellickson, Insecticide Residues in Milk and Milk Products, 22 J. Milk and Food Technology, 112, 145, 179. For an extensive bibliography see id., pp. 148-149, 181.
 
 
 [4]
 There has been no formal regulation governing DDT in milk. By informal rulings however there can be no DDT in milk. For proposed regulations on other pesticide chemicals see 23 Fed.Reg. 324 (Jan.1958); 23 Fed.Reg. 976 (Feb.1958).
 
 
 [5]
 DeWitt, H-Bomb in the Garden Patch, No. Car. Wildlife, Sept. 1957, p. 4; Springer Insecticides, Boon or Bane? 58 Audubon Mag. 128, 176; Strother, Backfire in the War against Insects, Readers Digest, June 1959, p. 64.
 
 
 [6]
 Biskind, Public Health Aspects of the New Insectricides, 20 Am.J. Digestive Diseases (1953), p. 331; Longgood, Pesticides Poison Us, American Mercury, July 1958, p. 33.
 
 
 [7]
 N.Y. Times, Sept. 13, 1958, p. 21.
 
 
 [8]
 See the comments by Congressman Lee Metcalf, Cong.Rec.App., March 18, 1959, A2375, Sept. 2, 1959, pp. 16300-16301. Congressman Metcalf said:
 'We all know of plant or wildlife loss from chemical controls—such as the death of fish in Montana trout streams in areas sprayed by DDT; the virtual wiping out of quail and rabbit populations in two areas treated with heptachlor in the South. Considerable damage to valuable fish and wildlife resources has occurred unnecessarily because chemicals were applied without sufficient knowledge of accepted procedures or without full regard to the consequences.'
 Rachel Carson wrote in the Washington Post, April 10, 1959, p. A12:
 'During the past 15 years, the use of highly poisonous hydrocarbons and of organic phosphates allied to the nerve gases of chemical warfare has built up from small beginnings to what a noted British ecologist recently called 'an amazing rain of death upon the surface of the earth.' Most of these chemicals leave long-persisting residues on vegetation, in soils, and even in the bodies of earthworms and other organisms on which birds depend for food.
 'The key to the decimation of the robins, which in some parts of
 the country already amounts to virtual extinction, is their reliance on earthworms as food. The sprayed leaves with their load of poison eventually fall to become part of the leaf litter of the soil; earthworms acquire and store the poisons through feeding on the leaves; the following spring the returning robins feed on the worms. As few as 11 such earthworms are a lethal dose, a fact confirmed by careful research in Illinois.
 'The death of the robins is not mere speculation. The leading authority on this problem, Professor George Wallace of Michigan State University, has recently reported that 'Dead and dying robins, the latter most often found in a state of violent convulsions, are most common in the spring, when warm rains bring up the earthworms, but birds that survive are apparently sterile or at least experience nearly complete reproductive failure.'
 'The facts that doses are sub-lethal may yet induce sterility is one of the most alarming aspects of the problem of insecticides. The evidence on this point, from many highly competent scientists, is too strong to question. It should be weighed by all who use the modern insecticides, or condone their use.
 'I do not wish to leave the impression that only birds that feed on earthworms are endagered. To quote Professor Wallace briefly: 'Tree-top feeders are affected in an entirely different way, by insect shortages, or actual consumption of poisoned insects. * * * Birds that forage on trunks and branches are also affected, perhaps mostly by the dormant sprays.' About two-thirds of the bird species that were formerly summer residents in the area under Professor Wallace's observation have disappeared entirely or are sharply reduced.
 'To many of us, this sudden silencing of the song of birds, this obliteration of the color and beauty and interest of bird life, is sufficient cause for sharp regret. To those who have never known such rewarding enjoyment of nature, there should yet remain a nagging and insistent question: If this 'rain of death' has produced so disastrous an effect on birds, what of other lives, including our own?'
 The article by Dr. George J. Wallace referred to is Insecticides and Birds, Audubon Mag. Jan.-Feb. 1959, p. 10. See also The Halogenated Hydrocarbons Toxicity and Potential Dangers (U. S. Dept. Health, Education and Welfare 1955) pp. 335 et seq.